Pages 1 - 75

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

```
PRAGMATUS AV, LLC,                    )
                                      )
            Plaintiff,                )
                                      )
   VS.                                ) NO. C 13-1176 EMC
                                      )
YAHOO!, INC.,                         )
                                      )  San Francisco, California
            Defendant.                )  Monday
                                      )  April 21, 2014
_____)  10:00 a.m.
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:


**For Plaintiff**:          FEINBERG DAY ALBERTI & THOMPSON, LLP
                            1600 El Camino Real
                            Suite 280
                            Menlo Park, California 94025
                       BY:  **MAC BELLOLI, ESQ.**
                            **DAVID ALBERTI, ESQ.**



**For Defendant**:          MORGAN, LEWIS & BOCKIUS, LLP
                            77 West Wacker Drive
                            Chicago, Illinois 60601
                       BY:  **JASON WHITE, ESQ.**




*Reported By:    Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                *Official Reporter - US District Court*
                *Computerized Transcription By Eclipse*

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

<u>**P R O C E E D I N G S**</u>

**APRIL 21, 2014                                          10:02 a.m.**

**THE CLERK:**  Calling Case 13-1176, Pragmatus versus Yahoo!.

Counsel, please come to the podium and state your name for the record.

**MR. BELLOLI:**  Mark Belloli for Pragmatus AB, with my partner Dave Alberti.

**THE COURT:**  All right.  Thank you.

**MR. WHITE:**  Good morning, your Honor.  Jason White for defendant Yahoo!.

**THE COURT:**  All right.  Good morning, everyone.

I would like to focus right in on what some of the critical issues are rather than go through a formal presentation.  I think that will be more efficient use of our time.

Then I'll give you a chance -- if there is something you want to add to the papers on some of the other matters, I certainly will hear that.

But let me zoom in on what appear to be some central issues here.  So front and center is the question of what audio video, in brackets, communication means and whether it has to be -- essentially, as I understand the debate, whether it has to be real-time, which requires synchronization, I would think, as well as, I think, bidirectional communications or can it be

just an exchange without requirement of real-time?

And when I looked at the patents themselves -- if you look at the '470, for instance, the abstract, the very first sentence says:

"A method of real-time communication between a plurality of users each with respective communications devices," et cetera, et cetera, et cetera.

Towards the end of that first paragraph it also talks about:

"...thereby enabling real-time communication, including video images of at least one user and real-time text messages displayed on the display associated with at least one user."

I also note, as the parties have pointed out, that if you look at the background of the invention in column one, the whole goal of this invention is to replicate in a desktop environment, to the maximum extent possible, the full range, level and intensity of interpersonal communications and information sharing which would occur if all of the participants were together in the same room at the same time, referred to as face-to-face collaboration.  And it seems to me that's the gist of the invention here.

It goes on to talk about how behavioral scientists talk about the importance of subtleties and complex visual cues, eye

contact, body language, which adds additional information, spoken words and explicit gestures.  And the whole point is to reproduce the beneficial effects of, quote, face-to-face collaboration in a distributed collaboration environment, using desktops and other devices to make it as if you're all in the same room.

     And if it's not real-time, I don't understand what we have.  I mean, isn't that the gist of this invention?

          **MR. ALBERTI:**  A large part of it, and some of the claims actually recite expressly real-time characterizations.

     The term "real-time" is not in all the claims, but even -- let's just set aside this issue for a moment.  Let's assume that all the claims cover real-time communications.

     Yahoo's premise is incorrect that real-time requires both bidirectional communication and synchronization.  When we talk about synchronization, when the patent talks about synchronization --

     And, Tom, if I could get up slide number 16 for audio/video communication?

     Synchronization is discussed in terms of what they call multimedia documents.  And what's going on there is, when you have multiple types of media -- for example, you have video together with audio -- you need the audio to be synchronized with the video so that you're not looking at video and you're hearing words coming out at a different time.

So we see here, I'm looking at the -- this is an excerpt from the '470 at Column 29, Lines 21 through 28.  It says:

"Only multimedia documents with real-time material need to include synchronization functions."

And if you go to the next slide, Tom --

**THE COURT:**  Hold on for a second.  Let me find the actual context of this.  29, Lines 21 through 28?

**MR. ALBERTI:**  Yes.

**THE COURT:**  So it's under subheading "Media Synchronization."

So it goes on to say:

"Audio and video segments can exist without being accompanied by the other.  If audio and video are recorded simultaneously, the preferred embodiment allows the case where the streams are recorded and played back with automatic synchronization, as would result from conventional VCR's, et cetera.  This excludes the need to tightly synchronize, lip sync, separate audio and video sequences.  Rather, relies on it's own encode recording capability of real-time audio and video storage server to deliver all closely synchronized audio and video directly at its signal outputs."

**MR. ALBERTI:**  Correct.  And so the point here is if you have both audio and video, that's when synchronization is

important.

However, the claims that we have here do not require both audio and video.  You can have audio only claims which are, for example -- take a look at the '470 patent.  For example, dependent Claim 8 recites:

"Wherein, the communications between the first and second users includes at least audio communications."

Meaning that the independent claim is broad enough to include just audio or, perhaps, just video.

And, further, it also talks about having just text communications.  So if you only have text, there is no need to synchronize the text with something else.

So Pragmatus isn't as concerned about real-time being part of this claim as it is these concepts that don't necessarily equate to real-time.  And, in particular, the sense of bidirectionality doesn't necessarily relate to real-time.

So if you had, for example --

THE COURT:  What is bidirectionality?  What do you mean by that?

MR. ALBERTI:  It means each party -- the way I understand Yahoo! to be interpreting this is that each party of a particular teleconference must both provide and receive audio, video or text.

Whatever conference is -- whatever type of conference is

being handled, each party would have to do both, receive and send.

But the patent teaches, very clearly, that you can have one-way video. And, again, I'm looking now at the '470 patent at column 38, lines 47 through 56. And this is, in particular, in the wireless embodiments. The patent contemplated that you may not have the bandwidth to support every type of media.

So here it says that:

"In this example, the connection provides control, data conferencing and one-way digital video (i.e., the laptop user cannot see the image of the expert), but the laptop's built-in camera, at a very slow -- but from the laptop's built-in camera, albeit at a very slow rate."

So he gets some of the stuff of the conference, but he doesn't necessarily get all of it. So you may have certain people in a teleconference bidirectionally communicating, but, yet, one party who is on a wireless device -- and, of course, wireless devices are covered by these claims, they may not be bidirectionally communicating.

THE COURT: Okay. Not everything is bidirectional, but something is bidirectional, otherwise you wouldn't have any communications. You wouldn't have communication going both ways, right?

MR. ALBERTI: Correct. And I think that's -- even in

Pragmatus' construction, you will see an exchange of information that's part of it.  So we're not denying that there is an exchange of information.  It's just not that all information in a particular conference --

THE COURT:  So some, but not all.

MR. ALBERTI:  Yes.

THE COURT:  You would say something has got to be bidirectional.

MR. ALBERTI:  Absolutely.  Otherwise, it would be --

THE COURT:  It wouldn't be communication.

MR. ALBERTI:  -- not quite a conference.

THE COURT:  So then the critical question is the synchronization.

So you're saying that the invention would include not all the -- in addition to the illustrations here and the preferred embodiment which shows screens and the face of somebody and the camera.  They're talking.  The whole idea of seeing body language, body cues, even though that's the main advancement or the gist of this thing, it is -- it could include, for instance, just straight audio.

MR. ALBERTI:  That's exactly what the claims contemplate.  And, of course, you have to look at the patent by what the claims say.

And the claims -- all of the independent claims are completely silent as to what the manner of communication is.

And then in the dependent claims they further narrow the invention in different ways.

For example, again, certain claims recite audio.  Certain claims recite wherein the communications include text.  Others say that the communications include video.  These are all different options for the communications, but there is no requirement that the communication include all of those things.

So in the context of, say, audio only, there is no video to synchronize it with; or in the case of text, again, there is no --

**THE COURT:**  So what would be the advancement -- if it's audio only, what does this invention bring to the table, other than our getting on a conference call?

**MR. ALBERTI:**  Well, the advancement that this brings, in particular, is -- there is a number of limitations.  You can see Claim 1 is very long, but one of the key features here is the ability to track where you've got multiple users so you -- Claim 1 requires at least three users.  It requires them to be tracked wherever they are logged in.  So this allows you to log in from different devices in different places.

And, finally, the claim also requires that you can have an existing conference going on between two parties, and it allows you to add a third party to provide a three-way communication by, again, tracking where these people are by use of information provided by their different client devices.

So it allows for a three-party communication.  It allows users to be tracked wherever they are logged in.

And, again, just to remind the Court, these patents do date back to 1993 when the internet was still more or less commercially in its infancy.  And so at the time systems like this just didn't exist.  And in this -- in these patents, as you can see, there is a lot of prior art considered here by the Patent Office.  These went through interparties' reexam and the claims remain the way they are, and that is agnostic as to audio video or text, the independent claims.  And it's only the dependent claims that add in the additional requirements of needing audio, video or potentially text.

**THE COURT:**  In the original claims, this comes up in the sort of estoppel-type argument, that I take it at one point the claims were explicitly all about real-time?

**MR. ALBERTI:**  Well, they explicitly recited real-time in the preamble and then the claims were amended.  So there are two independent claims in the '921 patent that do -- that's Claims 13 and 25, that do include the phrase "real-time."

**THE COURT:**  Right.

**MR. ALBERTI:**  And there are two claims in -- the rest of the claims, Claim 1 of the '929 and all the independent claims and the '470 no longer include that phrase "real-time."

But, again, it's not the real-time that gives us pause here.  You know, real-time, to me, means it's basically -- you

know, you send and you receive without a long delay.  It doesn't require synchronization, you know, unless you have multiple types of media happening at the same time.  For example, audio and video.  But because the claims don't require audio and video, synchronization doesn't seem appropriate here.

THE COURT:  And so your reaction to the language in, for instance, Column 5 of the '470, that talks about the preferred embodiment, this is Lines 23 through 28, which states:

"In a preferred embodiment the system architecture employs separate real-time and asynchronous networks.  The former real-time audio and video and the latter for non-real-time audio and video text, graphics and other date, as well as controlled signals."

I guess you're saying, in part, real-time doesn't have to be synchronized if you don't have -- well, it does say "real-time audio and video."  So that presumes, in that case, you do have to have synchronization.

MR. ALBERTI:  If you have both.  If you have both, obviously, you wouldn't want to see a video and then have the words come after.  You won't get me to disagree with that.

THE COURT:  Right.

MR. ALBERTI:  However, if you only have one, there is nothing to synchronize it with.

**THE COURT:**  All right.  So you're saying -- you would concede that the preferred embodiment does require at a minimum synchronized audio/video.  It could be accompanied by asynchronous networks --

**MR. ALBERTI:**  Communications.

**THE COURT:**  -- as well.

But it has to have that.  But I guess your point is both -- and this is only a preferred embodiment.  It's not -- there is no indication this is going to be exclusive to the exclusion at the outset where you can't import limitations from the preferred embodiment into the claims.

**MR. ALBERTI:**  That's correct, your Honor.  And there are a whole set of patents.  There is actually five pending between the parties in the Delaware case that all require audio and video in the claims.  So those -- you know, that claim set was directed specifically to the real-time audio/video aspects of the invention.

Now, of course, there are many aspects to these patents.  They are rather long.  And these two patents were focused more on the -- we'll call it the ability to put together a conference between two or more people -- actually, three people.  All the claims require at least three parties.  Being able to track those people and bring them together in some way, but not necessarily require audio and video in those communications.

And that's very evident when you look at the dependent claims that say at least -- you know, the communication is at least audio, or the communication is text, or the communication is video.

**THE COURT:**  All right.  Well, let me hear the response.  You have been patient.

If real-time is not a critical issue, but whether or not you have to have synchronization and, therefore, this -- the argument is that you don't have to have, as part of the invention here, both audio and video communication -- it could be one or the other -- without the need for synchronization and that would still be something claimed by the patent, what's wrong with that argument?

**MR. WHITE:**  The answer to that is, your Honor, I think you need to start back to where you originally started your questioning today, is that the claims always have to be interpreted in light of the specification, as well as other intrinsic evidence, which is file history, appeals, reexams and everything.

And I think any person reading these patents like you, after doing that is left with the unmistakable impression that the synchronized bidirectional aspects of these are critical to the claims and, therefore, they have to be included in there.

The idea that the claims may cover only video or only audio does not remove the need for both bidirectional

communications and synchronization.

Synchronization can happen within the audio itself.  If I'm talking to you over an audio only communication, as my co-counsel here, compatriot said, they agree that there can't be a delay between the audio and video.  That same has to happen if we're talking only on the audio.  We can't have significant gaps, significant delays.  It can't only be a one-way communication or it wouldn't be a communication between the two users.

**THE COURT:**  What does that have to do with synchronization?  That may be delays that may go to real-time questions --

**MR. WHITE:**  That's exactly what we're talking about, is the synchronization has to be between the two folks.  So if I'm communicating back with you, I have to have the ability to hear back from you and, also, have those two linked up, if you will.

So you can't be disparate communications.  I can't talk to you and have a five-minute delay before you can respond back to me.

So the synchronization is not meant to be among different types of communications.  It's meant to be amongst the individual communications themselves.

**THE COURT:**  So we have a fundamental difference, sounds like, between each party's interpretation of

synchronization.

You're saying -- they are saying synchronization is syncing audio and video, lip syncing or whatever degree of syncing is necessary.  Whereas, you're saying synchronization may be -- occurs even in just the audio universe; that if there is a delay, they are not synced.

**MR. WHITE:**  Correct.

**THE COURT:**  I don't know.  Do you have something that suggests that synchronization has to do with time delay?  Sometimes time delays are inherent in the distance traveled or in the circuitry that's required.  I'm not sure that's syncing.  That's just a question of time.

What is it that is synchronized?

**MR. WHITE:**  Just the communications back and forth.  So I think it is that timing aspect of it; that when I communicate back with you, I've got not only bidirectional, but you also have to have -- it's got to be linked time-wise.  You can't have a one-way communication be a communication between the users.

As long as we get that aspect of it, whether we say it's synchronization or some other way to go about describing that, the key is it has to be that back-and-forth communication bidirectionally, both ways, but it also has to be linked in time, if you will.

**THE COURT:**  Well, I didn't hear any disagreement from

your opponent that there has to be at least some bidirectional communication.  It could be supplemented by one directional; like, you know, one has a video camera and the other doesn't.

But in order for there to be a, quote, communication there has to be a back-and-forth, that's not just sending an email to be picked up a day later and send it back.

MR. WHITE:  That's right, your Honor.

THE COURT:  So I don't think that there is much dispute there.

I guess the question is:  If you want to import the term, you know, "synchronization," I -- I guess, you know, now that we seem to have a difference of opinion even as to what that means.

If you take Pragmatus' definition of syncing, that is syncing audio to video, would you agree that that is not required by either the '470 or the '921?

MR. WHITE:  It depends on the context.  I think if you -- which claim term we're looking at and which limitation we're looking at.

Because I think if you do look at the textual communications, for example, when we get to that, that is done only on top of or in connection with some other underlying type of communication.  The only textual communication is an annotation of a website that's shown, a screen that's shown or something else.  So in that context I think that there has to

be synchronization to there.

So I think it's important if we have to look limitation-by-limitation to see what we're talking about and not just --

**THE COURT:**  Since you raise that question of text, texting, what do you do with the fact that Claim 34, which is dependent on 29, says "wherein the communication includes real-time texts," or as to Claim 21 it says just "texts."

So it's obviously under the doctrine of claim differentiation.  21, the independent claim is broader so it can include nonreal-time texts.

Does that impact the synchronization argument you just made?

**MR. WHITE:**  I don't think so because I think you have to look at the patent and see how they define the textual communications.  And it's in the examples that we gave you, but I think if you look at the -- data conferencing is sort of where we start with this.  And I think that's probably one of the helpful places to start because it's a term that's really defined in the specification.

Many of the terms that we're looking at today really aren't really found in the specification, but the term "data conferencing" is.  And that's -- I can get you a citation for that, if you'd like to see that.

If you look in the '470 patent, Column 4, Lines 63 is

where it starts near the bottom there.

THE COURT:  Okay.  Which one?

MR. WHITE:  '470.  And I can also put it up on the screen for you.

THE COURT:  Column 4?

MR. WHITE:  Correct.

THE COURT:  Of the '470.  Line -- which line?

MR. WHITE:  63.

THE COURT:  63?

MR. WHITE:  If you look, you'll see a sentence that starts:

"Data conferencing, in turn, includes snapshot sharing."  And it's got a bracketed definition of what that is.

"Application sharing," it's got a definition of that.

"Shared whiteboard," it's got a definition of that.

And "associated telepointing and annotation."

So data conferencing consists of one of three things: Snapshot sharing, application sharing or shared whiteboard. And then on top of that, you can telepoint or annotate the things that are shared.

And that -- if you look at the patent, that is the only description of what the text type of communications are here. So they don't ever describe text communications being something that exists by itself.  Sort of the texting that everybody does

today, that's not something that's discussed in the specification anywhere.

THE COURT:  Let me look at the claims again here.  So what would Claim 21 -- what would nonreal-time text mean in this context in contrast to dependent Claim 34?  How would that work?

MR. WHITE:  That's a good question, your Honor, because I'm not sure.  I haven't seen any examples in the specification as to what that's meant to cover.

When you look at data conferencing and how it's explained and then how the texting comes on top of that, I think this may be a situation where the claims were drafted, you know, much later in time and really don't have a tight connection to what's actually in the specification, because I don't see anything.  Maybe we'll hear from the other side as to what they think it means.

But when you look at this section on the data conferencing, this is really sort of a definition as to what this covers and it talks about how the text is used to annotate or to supplement a different type of communication.

THE COURT:  Well, let me go back -- I want to get back to you on some of the points.  But let me ask:  Is the only texting that's envisioned here that in the context of data conferencing?

MR. ALBERTI:  No.  And I think that's very clear when

you take a look at the claims themselves.  For example, Claim 7 of the '470 patent reads:

        "The method of Claim 6, wherein the data conferencing includes text communications."

     So here the claims are specifically saying that text is part of data conferencing, but then you have other claims.  For example, Claim 21, the method claim of Claim 16, wherein the communication includes text.  And as you pointed out in Claim 34, the method of Claim 29 wherein the communication includes real-time text.  So --

            THE COURT:  What kind of communication, other than data conferencing, can include text?  What's an example of that?

            MR. ALBERTI:  Well, for example, you can have -- it depends, really, how data conferencing is defined.

     So you can have both -- for example, there is an example of a whiteboard given.  Now, what exactly a whiteboard is, again, up for interpretation.  But you can have people engaged in sending text messages back and forth, which is contemplated by the patent.

     In the preferred embodiment it's part of a conference where you can be looking at something else at the same time.  But, certainly, the claims are limited to the preferred embodiment.

     And what's been disclosed here in the patent is the

ability to do a lot of different things.  One of them is to engage in an audio communication.  One is to engage in a video.  One is to send messages back and forth.  There is a messaging button that's part of the user interface and allows text messages to be sent to everyone within a particular conference.

Now, whether that conference includes something other than text communications, again, it depends on which claim we're talking about.

The way Yahoo! would have it is that you would read in the preferred embodiment that whenever you have text, you also have to have a data conference, that's clearly not what the claims say.

THE COURT:  You could have a situation where you're having a typical audio/video conference, but people can also send simultaneously text messages; not tied to any data, but just sending a message to other participants.

MR. ALBERTI:  Correct, yes.

MR. WHITE:  Your Honor, I would ask where that is disclosed in the patent, because I think you'll look and you will not find it there.

The only reference to the text communications is in connection with the data conferencing, which is where you started with your question.

THE COURT:  What's the answer to that?

MR. ALBERTI:  Again, the preferred embodiment is part

of a screen that includes a data conference in this embodiment, but there are a number of buttons shown in that screen.  So whether or not, you know, you can have one without the other.

Again, in the preferred embodiment it can be part of a data conference, but it's not necessarily so.  And the claims -- again, it's a typical, you know, defendant.  Yahoo! has got good lawyers.  They are going to point to the preferred embodiment and they are going to try to read it into the claim.

But, again, the claims are very clear.  When it says "text is part of at data conference," the claims actually say that.  And the claims actually contemplate when it's not part.  And you have to give weight as to what the patentees --

THE COURT:  It take it your argument that Claim 21 of the '470 simply says the method of Claim 16, which sets forth the general architecture of this thing, wherein the communication includes text.

So that it could be -- text could be part of the communication that is set forth in Claim 16.  This method of associating a first user and second user and indicating, you know, sort of who's on and who's not and allowing a -- and allowing a third party to be added.

MR. ALBERTI:  Correct.  And it's important, again, to take a look, also, at Claim 7, which I think shows that clearly here in Claim 7 the patentee is contemplated that text would be part of data conferencing.  And you have to contrast that with

the other claims.  And when you have different language used in different claims, you're not supposed to equate the two.

THE COURT:  Well, but Claim 7 just simply implies that you can have data conferencing without text communications.  That doesn't say that text communications can exist outside of data conferencing.  That alone is not -- doesn't do it.

MR. ALBERTI:  Well, Claim 6 -- okay.  So if we -- if we -- we go back to what Claim 6 says, and I think if we can just -- that's --

THE COURT:  That's that you have to have at least --

MR. ALBERTI:  Right.

THE COURT:  -- audio, video, snapshot sharing and data conferencing.  And then Claim 7 says you've got that.

But this is where data conferencing includes text.  So you can have data conferencing with or without text under Claim 6.

MR. ALBERTI:  True.  And under the other claims, for example, Claim 21, you can have text just as part of the communication.

THE COURT:  Well, that's what I say.  Your best argument, it seems to me, is Claim 21.  I'm not sure what 7 does.  It provides the inverse, but not --

MR. ALBERTI:  Right.  Well, it shows if the patentees intended text to be part of data communication -- or, data conferencing, they certainly knew how to claim that and they

did claim that in Claim 7.  They did not claim that, however, in Claim 21.

So my only point is, if you take a look at what the patentees claimed, you could see there is certainly an intent to include text as part of data conferencing and then there is an intent to include it separately just as part of the communication.

**THE COURT:**  Well, perhaps with your -- as I understand it, the use of the term "communication" in 21, "communication" means similar things, I would assume, throughout the patent.  And the communication in Claim 6 includes a number of things; data conferencing being one of them, but not the only one.

So your opponent's argument is that, well, what Claim 21 really means to say is that the method of Claim 16 wherein the data conferencing includes text, that's equating communication with data conferencing.  And your comeback with that is that Claim 6 doesn't -- itself illustrates that a term communication is broader than just data conferencing.

So it comes back to the question:  Why can't 21 include communication other than data conferencing that includes text?  And his illustration is:  Well, you can have -- basically send text messages through participants in the conference, the video conference, can send messages to each other, not connected to any particular data or teleprompting or something else.

**MR. WHITE:** Sure. The response is pretty easy on that one, your Honor.

That's not disclosed anywhere in the patent. This is not a situation where it's just the preferred embodiment that shows text being a supplement to data conferencing. It's the only embodiment. It's the only discussion in the patent of where you've got the text being used. There is no suggestion that you could send a text message like we all send today without having the data conferencing.

**THE COURT:** So, in other words, that embodiment, preferred or not, is never discussed in the specification.

So your argument is we shouldn't read this claim language, which would suggest otherwise on its face, in the matter advocated by Pragmatus because if you go through the -- I don't know how many pages of specifications and all the diagrams and figures, there is not a single indication here that that use of text --

**MR. WHITE:** When you read the text, that's right, you won't see a description of that.

And I think the other claim that's not inconsistent, your Honor, is the dependent claim says, sure, you can add text for the communication, but that really only comes into play when the communication is the data conferencing. It doesn't say this text can be used with any type of communication no matter what you're talking about.

**THE COURT:** Well, so why doesn't 21 read: The method of Claim 16 wherein the data conferencing includes text? Why the use the term "communications"?

**MR. WHITE:** I think that -- they intended -- so they intended the claim to be broader than the independent claim. It can have multiple different types of communications.

My suggestion is that the data conferencing is implied when you use the text. So the only time the text is referred to in the spec is when you're doing the data conferencing. So the dependent claim is really only applicable when you've got an underlying communication being the data conferencing.

You can have other types of communications -- audio, video -- but in those contexts if you don't have the supporting, the fundamental anchor of the data communications, the data conferencing, then the text just simply doesn't come into play.

**THE COURT:** Let me go back to the fundamental question that I started to ask, and that is: Do you concede that if you had conferencing that was only audio or only video, that that would be encompassed by the invention here?

**MR. WHITE:** Yes. So the communications here could be audio only, it could be video only; correct.

But we do not concede that you could have text alone or that you could have text in combination with audio or video or something like that.

THE COURT:  All right.  And if you only have audio or only have video and not the combination, you wouldn't need synchronization in that sense?

MR. WHITE:  In the sense of trying to tie the audio and video together, correct.

THE COURT:  So your synchronization is really about the timing of the communication to make sure there is an effective two-way communication.

MR. WHITE:  That's right.

And, also, when you're adding something on top of it.  So if you do have the audio and video, those do have to be synchronized, right?  So if you're going to pull multiple things together and if you're going to add the text to top of data conferencing, that also has to be synchronized.

So synchronization is important, and it's important in all the different layers.

THE COURT:  All right.  Let me get your comeback, then, on this other definition of synchronization; meaning, a meaningful conversation that can occur.

MR. ALBERTI:  Well, first of all, looking at what the patent says synchronization is in the context of the patent, they talk about lip-syncing as in syncing the audio and the video.

Now, to extent we have multiple media --

THE COURT:  Where do I see that?  Show me...

MR. ALBERTI:  Can we switch back?  '470 patent, Column 29, Lines 21 through 28.

THE COURT:  29, which column?

MR. ALBERTI:  Column 29.

THE COURT:  Yeah.

MR. ALBERTI:  And starting at Line 25:

"Only multiimedia documents with real-time material need include synchronization functions."

And then it goes on to say:

"Audio or video segments can exist without being accompanied by the other."

And then:

"If audio and video recorded simultaneously, the preferred embodiment allows a case where the streams are recorded and played back with automatic synchronization."

And then it goes on to talk about:

"...the need to tightly synchronize, i.e., lip-sync, separate audio and video sequences."

So, clearly, here when it's talking about synchronization it's talking about having -- trying to synchronize something with a running audio or video stream.

So, again, I don't think synchronization is appropriate here.  I wouldn't object to having something like, you know, without some -- without substantial delay or something to

reflect more of a real-time nature.  However, synchronization just does not seem appropriate in view of the teachings of the specification and in view of sort of what real-time communication is when you're only talking about a single media such as audio, video or text.

**MR. WHITE:**  Your Honor, if I may.

I think that there is a pretty simple response to that. If you look through the patent -- and you remember from the jurisdiction, the technology tutorial that we gave you -- one aspect of the user interface that Mr. Alberti has talked about are some control, control aspects.

And the patent talks about allowing somebody to put somebody else on hold, for example, during one of these communications.  It could be audio, could be video, could be both.  But if you don't have synchronized communications between these devices, there is no way for one individual to put another individual on hold, especially in the context of the three-way communication, and then to also get that person off of hold.

So, remember, before we talked about these call handles and all the calls are controlled on the back end side of things, and then when a user -- for example, if I'm corresponding with you, I have the ability to put you on hold by selecting the hold button.  That communication has got to go and be synchronized with your device.

And if you look at even the patent specification that Mr. Alberti was referring to, it talked about -- I'll get the exact language.  The lead-in to that section was:

"Next to be considered is how the current invention guarantees synchronization between different media components."

So you've got different media components.  You've got different workstations, devices that are communicating, and there has to be synchronization between them.

Now, I know the patent says in this example we're going to talk about documents and synchronization is important here, but I would suggest that when you look through this, and as we get to some of the other claim terms, synchronization is going to be important for the devices to be synced with one another, whether it's audio only or video only.  It's not just merely a time delay.  There's other control aspects that require the synchronization.

THE COURT:  Who do you define synchronization?  It's not just time delay.  What do you mean by syncing other devices?

MR. WHITE:  The two have to be both in communication with one another and there have got to be back-and-forth communications, I guess at the audio level and, also, at the control level.

I guess that's what synchronization means, is in the

common sense, as Mr. Alberti was talking about it, that you link together.  You make some sort of guarantee that the audio and video are corresponding to one another.  You've got to have the same thing with the call setup and the call communication.  Those have to be -- everybody has to be on the same page and getting the same information in a timely manner.

THE COURT:  Well, isn't that already implied in the language?  You have to have a communication going back and forth?  It talks about communication between the first and second users.

MR. WHITE:  That's exactly right.  "Between" is a key aspect of that.

THE COURT:  Yeah, it's already in there.  So if that's your main point, I'm not sure what more we have to add.

It seems to me pretty obvious that communication by just the ordinary sense of the word means sending information, and it says "between the first and second users."

MR. WHITE:  I two say the other piece of that is both sides have to have the same information.  So transmitting -- if I put you on hold and I -- my computer sends a signal to your computer to put you on hold, your computer has to recognize that and actually do something with it.  It's not just a matter of communications going back and forth.  There has to be some utilization of it, some recognition of it.

Again, same thing with the audio/video.  There is going to

be signals given to make sure these two are linked up.  You've got to have the same thing.  I can't just -- just sending you information is not going to do it.  Your computer has to receive it, acknowledge it, react to it, use it in some form.

So I'm struggling a little bit with how to specifically articulate it.  That's really what we're talking about here, is there has to be a meaningful linkage, if you will, of the different components so that everybody is on the same page and the communications do flow back and forth freely and, also, accurately.

**MR. ALBERTI:**  Again, I'm not sure what being on hold has to do with synchronization.  I'm not sure that the claims require you to put somebody on hold.

And what I see here is, again, when the patent is talking about synchronization, it's talking about multiple media; multiple media components, as counsel said.  But multiple media components means when you've got audio with video, you want to sync the two.

If what we're talking about is communication that includes both audio and video, I don't think we would necessarily object that those two should be synchronized, but here we've got -- the patent clearly contemplates you can have one without the other.

And so I think by adding synchronization into this claim term, it's something that the patent certainly doesn't

contemplate.

And, again, I just see it as a potential cause for mischief down the road whether the experts start getting involved in what's synchronization, what's not. Certainly, it's not required by these independent claims.

THE COURT: Well, I will say if you look at Column 2 of the '470 around Lines 16 through 20 or so, there is a reference there to asynchronous, which I take it is the opposite of synchronize, saying that -- using as an example:

"...answering machines, voicemail, fax machines,
conventional electronic mail system to provide
incomplete solutions to the problem presented by
deferred (asynchronous) collaboration because they
are totally incapable of communicating visual cues,
gestures, et cetera."

There is a little bit of a hint that synchronization does -- it's not just syncing, lip-syncing audio and video, but syncing so you have, well, real-time communication not deferred.

MR. ALBERTI: Again, when we're talking real-time versus deferred, I don't think -- again, those kinds of terms don't give me pause, because I think they are very clear. A jury can understand it is. I think they are probably even consistent with the patent.

What does give me pause is a notion of synchronization

where in the patent it's only talking about syncing two different types of media, and now all of a sudden it gets imported into all the claims, and now it's something for experts to sort of opine on and give different, you know, understandings of.

Again, I think it's not -- it's not anywhere required by these claims.  It's not taught by the patent.  And it seems to me that it's probably going to be something that the experts disagree on later.  Again, it's not just necessary here.

THE COURT:  In the end I'm not sure how much difference there is.  I think what your opponent is saying is there has to be real-time communication at some level going back and forth.  I think he calls that synchronized communication.  You don't have a problem calling it real-time.  But, I mean, whatever it is, there's real communication going back without substantial delays like a voicemail.  There is actual --

MR. BELLOLI:  So, again, if we replaced synchronized with -- which the patent is treating certainly in a different way, talking about lip-syncing here, and we use something like an exchange, a real-time exchange of information, audio and video information, again, I don't -- I can tell you, I don't have a problem with that.

THE COURT:  Okay.  Well, so if we add the words "a real-time exchange of audio and video information," doesn't

that really cover the gist of what you're concerned with; that is not substantial delay?

You call it sync, but it's -- other people would call it real-time, other people would call it something else.  Doesn't that get to the gist of what your concern is?

**MR. WHITE:**  It gets part of the way there.  The other part of it, though, is I think it pops up in a number of different contexts.  Like if you talk about controlling, putting somebody on hold.  I mean, it's got to be -- just transmitting it enough is not going to do it.  It has to be received and acted upon and used for something.

The other example I would give you is with the text communications.  And there is a Column 36, Line 42 talks about how, again, things can be annotated.  And if you look, there is a sentence that talks about, "either party to the share."  So now you're sharing a screen or --

**THE COURT:**  You're in Column 36 of the '470?

**MR. WHITE:**  Correct.

**THE COURT:**  What line?

**MR. WHITE:**  It's line -- looks to be about 42, is where this starts.

**THE COURT:**  "Either party to the share."

**MR. WHITE:**  Correct.  "...can annotate."

So you've got somebody sharing a video, sharing a screen, something.

"Either party can annotate that image using the drawing tools, which permits typed characters to be displayed."

So you're on the share. You type that, and it's going to be displayed on both parties' screens.

THE COURT: And that's, certainly, contemplated as one of the important things that this invention does. Your response is that's a preferred embodiment.

MR. ALBERTI: It doesn't say anything about synchronization. What is it synchronized with?

Again, if it's real-time, it's real-time. I don't see how real-time doesn't cover counsel's concern here. I think adding synchronization -- again, I suspect we're going to add it and we're going to hear later in this case that synchronization means something completely different, and that's what we're concerned about.

MR. WHITE: And that's not the case, your Honor. I think the synchronization is everybody has to see the same thing. So I can transmit data to your computer all day long, but unless your computer is actually using it and syncing up the delay on your computer with the display on my computer, that doesn't get you there.

So that's why I hesitate, is we're on the right track. You're talking about the bidirectional, back and forth, the real-time aspects of this. But just transmitting data doesn't

do it if I don't see what you see.

THE COURT: Well, let's look at the claim language. Does the claim language already encompass the idea that you're seeing the same thing? People are sharing?

MR. WHITE: I don't think it does, your Honor. I don't think it does in the context of audio and video or data conferencing.

I mean, that's why we want to make sure that not only are the communications going back and forth, but they are being received and utilized in such a way that everybody is on the same page.

It's a little bit of a colloquy, but everybody has got to be on the same page. You've got to be seeing the same thing. You've got to have people hearing the same thing or seeing the same thing, that they're sharing the data.

That's why I think synchronization gets to that point. Everybody is synchronized in what they are seeing and what they are doing. If there is another way to describe it, I think we can explore that, but it's not meant to be a complicated concept. It's just meant to make sure that everybody is seeing and sharing information.

THE COURT: Well, is there a problem introducing a concept of share, like "exchange of audio and video information shared by the participants," something like that?

MR. ALBERTI: "Real-time exchange of audio and video

information shared by the participants."  No, I think that's acceptable.

THE COURT:  That's clearly what this thing is about.

MR. ALBERTI:  I mean, you're going to -- you know, there are -- like, for example, you could put someone on hold. You can mute someone.  It's not always everything is always going to be shared; but so long as it is at some point in time, I think that we're okay.  It's not 100 percent of the time you will be getting everything that you're receiving and vice-versa.

THE COURT:  So it's not always shared, but --

MR. ALBERTI:  At some point there is sharing.  I'm just saying you can mute somebody; that's clearly in here.  You can put somebody on hold.

You know, it's not that every single thing you produce is necessarily going to be sent and received all at the same time.

THE COURT:  Generally shared.

MR. ALBERTI:  Yeah, yeah.

THE COURT:  There are exceptions to that if somebody is on hold or something else.

MR. ALBERTI:  Mute, yeah, things of that nature.

MR. WHITE:  I come back to synchronized again.  Not trying to read much into that but if somebody is on hold, everybody knows that person is on hold.  Somebody is off of hold.  Again, you're linked in some way.

So synchronized is what I default to, but I think we're talking about the same thing.

THE COURT: Right now the closest I can come up with is something like "generally shared by the participants" without getting into every specification and exactly what it is. I mean, I think that kind of gets to the gist of what you actually don't disagree on.

MR. ALBERTI: I think plaintiff would agree with -- if you could read that back?

THE COURT: Okay. So my proposal would be -- here I am drafting this thing:

"A real-time exchange of audio/video information generally shared by the participants."

So it covers the generally, allows for some flex for people muted off or -- I don't know if you can block people off from visual as well, but it still conveys that the intent of this is that you should be sharing this information sort of on the same page for the most part.

MR. BELLOLI: Plaintiff is fine with that, your Honor.

MR. WHITE: I still -- as long as we capture the concept of everybody being connected and linked, and not that somebody can kind of drift off.

So if it's generally shared, I don't want that to suggest that sort of one person can kind of fall out, if you will, just

get lost somewhere.  If I want to take you off mute, I've got to be able to do that.

So that information has to be -- the communication has to be shared with you.  So that's the only concern I see.

THE COURT:  I think that's inherent in the term "communication."  Otherwise, you don't have communication if it's not a shared experience.

MR. WHITE:  I'm not sure that the parties would have agreed on that prior to you saying that.  So that's at least a step in the right direction.

THE COURT:  Okay.

MR. WHITE:  Are we talking about just now the phrase "audio/video communication"?

THE COURT:  That's where I started.  I understand there's related issues of data conferencing and text communications.

MR. WHITE:  Correct.

THE COURT:  Which we should probably talk about as well.

I mean, we did talk about data conferencing.  I guess the -- again, you want to add -- you want to limit that or add the limitation that, again, it be synchronized, bidirectional and, also, includes -- well, you want to include snapshot, display and control of running application and include annotating the share data.

MR. WHITE:  I think that's the biggest issue on the data conferencing, is that if you look at the spec, including the section I cited to you already, there is really an underlying predicate that the -- that there is a couple different ways that this can happen.  You've got to either share a snapshot of a computer screen or share control over a program.  It's almost a definition.

It's the closest thing we've got to a definition in this case where a lot of terms don't appear anywhere in the spec.  This one we've actually got a real good indication what the patentee meant.  And we've basically taken our definition verbatim from the specification.

THE COURT:  All right.  So what's an example of a communication session that's being -- sharing computer data in real-time, but does not include either a snapshot or sharing in the control and display of an application?

MR. ALBERTI:  Now we're going to move on to data conferencing.

THE COURT:  Yeah.

MR. ALBERTI:  Okay.  Let me get defendant's construction handy to look at it.

(Brief pause.)

MR. ALBERTI:  So I see a couple issues here.  First of all, defendant's construction mentions sharing a snapshot and sharing both display and control of a running application,

but it doesn't talk about, for example, the whiteboard example in the patent.

So in the patent it talks about data conferencing. Sharing information using a whiteboard. So, for example, you've got a blank. It says, "equivalent to sharing a blank window." So you have a blank window on your computer screen and you can share data within that window. That could be text data, certainly contemplated by the patent. You can share text data within a blank window.

And for some reason defendant left that example -- kept two of them, but left that important one out of its construction. I suspect I know why that is, but it's certainly a glaring omission.

**MR. WHITE:** The answer to that, your Honor, is I think it's covered by one of the other two.

So if you look at the parentheticals, data conferencing says "includes snapshot sharing, which is sharing a snapshot of a selected region of the user screen." And then we talk about the whiteboard, it says "sharing a blank window." If that's part of the user's screen, it's covered.

The second example is application sharing, sharing control of the running applications. I assume the whiteboard is a running application, so it's going to be subsumed within there. If you wanted to add that as a third example, to say "sharing snapshot, application sharing or sharing whiteboard," we would

be fine with that.  We tried to distill it down a bit and make it a little more succinct.

THE COURT:  Let me ask a question.  To sort of replicate the language of the Column 4, Lines 61 through Column 5, Line 1 and include shared whiteboard, is there an objection?

I understand your general point, that this is a preferred embodiment and -- but what else -- is there anything --

MR. ALBERTI:  If it includes "sharing a blank window," like what is discussed here, we don't have a problem with it.

I think that would, at least in my mind, cover everything. Again, any way that you can among two or more parties share computer data in real-time, which was what our construction was.  If we include, you know, the equivalent of sharing a blank window, I could live with that.

THE COURT:  All right.  Well, so if we added to Pragmatus' definition, which does include the real-time component, which I think encompasses the bidirectional nature and what you say, synchronize, we've now described as having a -- without substantial delay, real-time back and forth, and then -- but then add "that includes," then adds these -- those items, it seems to me we've satisfied both your concerns.

MR. WHITE:  At least on a high level it sounds like we're on the right track with that, your Honor.

THE COURT:  All right, good.

And when it comes to text communications then.

MR. ALBERTI:  Yes.

THE COURT:  Again, I'm not sure what we have to say. I mean, again, you have no objection to real-time, or do you?

Actually, here there is a claim, at least in the '951, that does -- or it is, no, the '470, that distinguishes -- yes, that's right.  Claim 34 and 21, "real-time text" as distinguished from the independent Claim 29, which just says "text."

So I take it that's why you didn't include the term "real-time" in your -- in Pragmatus' proposed definition, but you did include it on data conferencing; that you have --

MR. ALBERTI:  Correct.

THE COURT:  -- you have claim differentiation here.

MR. ALBERTI:  Right.  And, certainly, the patent contemplates asynchronous type of text.  For example, email would be an asynchronous text, which doesn't have to occur in real-time.

So if you have email on top of -- or something similar to that on top of everything that you had in Claim 1, that would be something --

THE COURT:  How would that work?  How would you have a nonreal-time email that would be part of the communications going back and forth through this device?

**MR. ALBERTI:**  Well, the patent clearly contemplates that.  So, for example, if you take a look at Claim 9, it talks about:

"Wherein at least one or more of the collaboration" --

I'm sorry.  I was looking at the '921 patent.

**THE COURT:**  The '921?

**MR. ALBERTI:**  Yeah.

(Brief pause.)

**THE COURT:**  Yeah.

**MR. ALBERTI:**  Okay.

"Wherein at least the one or more collaboration initiation programs and the one or more service programs are further operable to allow the second user to send an email to the first user."

So basically on top of everything you have on Claim 1, you also have the ability for some asynchronous communication, for example, an email.

So, again, the independent claims have to be looked at as standing on their own merit.  However, you can add something to that that is of an asynchronous nature, as opposed to, say, a text communication that would occur on a whiteboard, a blank window that's being shared between the participants in a call.

Something in the data conferencing sense would certainly occur more or less in real-time versus an asynchronous text

communication.

THE COURT:  So Claim 9 sort of stands in contrast to Claim 26, which is dependent on Claim 25 that talks about the communication including real-time text.  That's the latter thing you referred to, where there is actual text messages going back and forth --

MR. ALBERTI:  Correct.

THE COURT:  -- real-time.

Whereas, Claim 9 allows for kind of a supplement to the real-time conferencing that's going on?

MR. ALBERTI:  Correct.  It's something on top of whatever the real-time conference is already occurring.

THE COURT:  And "text" is broad enough to include email?  I guess it is literally.

MR. ALBERTI:  Yes.  Email can be a text communication.  It can also include a video file or an audio file or something of that nature.

THE COURT:  Any comments to that?

MR. WHITE:  I think there are a whole bunch of problems with that.

So, first of all, when you're looking at Claim 34, it talks about the text being a part of the communication.  So you're talking about text communications being sort of embedded in as part of the broader communication.

THE COURT:  Okay.  Now we're talking about the '470,

it sounds like.  We were on the '921 --

MR. WHITE:  Correct.  I think you need to look at both in parallel.  Because the claim you're looking at in the '921, it doesn't talk about anything about being part of the communication.  It's basically saying:  All right.  In addition to having your ongoing communication, you could also send an email to somebody else.

Now, that's fine, but it doesn't in any way suggest that an email or a generic or one-way text communications are part of the communication, versus --

THE COURT:  Not part of the term "communication" as that term is used in Claim 1, for instance.

MR. WHITE:  Correct, correct.  It's basically saying, as I think Mr. Alberti said, it's an add-on.  It's something that's superfluous.  In addition to.

We're not talking about as part of the communication I send you an email and that's part of our real-time back-and-forth.  Something completely different.

Versus in the '470, we talk the text, where it says the communication comprises the text.  Then I think you have to look and see what the patent talks about within communication texting, and that is the annotation that we talked about that requires the data conferencing as the underlying part of it.

You just can't -- this patent did not invent email.  It did not invent generic text communications.  If you take the

definition of "text," it would include anything.

Communications involving characters.  What does that mean?

I just don't think that's in any way in line with the specification here, the intrinsic evidence as a whole.

**THE COURT:**  So the term that we're trying to construe appears in the '470 patent in Claims 7 and 21, right?

**MR. ALBERTI:**  Right.  It's only in the dependent claim.  Certainly, we are not contending that our -- Avastar invented email.

So this is only -- again, it's only an add-on type feature to certain claims.  In certain claims it does clearly have to be real-time.  And when it says "real-time text," that limitation should certainly be applied.

However, it also contemplates text that would not be real-time, very clearly laid out in the claim language.  In certain cases it says "real-time."  In certain cases it does not.

**THE COURT:**  Well, I'm wondering whether it's uniform. If you look at Claim 7, it says:

A method in Claim 6 where you're having communication with all the stuff, including data conferencing.

Claim 7 says:

"The method of Claim 6 wherein the data conferencing includes text communication."

So if we just look at the text communications in that context, in the data conferencing, wouldn't text communications -- that would have to be real-time.  That would have to be --

MR. ALBERTI:  Sure.  They are part of a shared window in that context.  However, for example, in Claim 21, we have "wherein the communications include text."  It's not necessarily part of data conferencing there.

THE COURT:  So it's not part of data conferencing, contrary to your opponent's position in Claim 21.  There's where you could have these text messages going back and forth between the participants while a video conferencing is going on.

MR. ALBERTI:  Correct.

THE COURT:  And not necessarily part of a shared window dealing with this data.

MR. ALBERTI:  Correct.

THE COURT:  So, actually, in 7 -- so you may actually have a slightly different connotation in Claim 7.  Even though it uses the word "text," one says "text communication," 21 seems different than 7.

7 is within the context of data conferencing, and you acknowledge that has to be real-time at that point, part of a shared window.

MR. ALBERTI:  Yes.

THE COURT:  Whereas, in 21 it's a broader notion

because it's not encompassed only within the realm of data conferencing, but within communications generally.

MR. ALBERTI:  Correct.

THE COURT:  So that suggests that maybe one definition may not be enough.  It seems to me different things in context.

MR. ALBERTI:  When we look at Claim 7, we will have already defined "data conferencing."  So when it says "wherein the data conferencing includes text," if we -- text communications --

THE COURT:  The limitation is already there.

MR. ALBERTI:  Yeah, the limitation is already there. It has to be part of it by the plain and ordinary language of that claim.

However, importing data conferencing into text, again, it would be contrary to what the intent of these claims are. Because in Claim 21 it just says the communication includes text, not necessarily as part of a data conference.

THE COURT:  And it appears again in the '921.  I see in Claim 26, which is dependent on 25, where it talks about "wherein the communication includes real-time text."  So "real-time" is added as an adjective there.

Does "text" appear somewhere else in the '921?

MR. WHITE:  Claims 2 and 24 also, your Honor.

THE COURT:  2 and 24?  "Real-time texts."  24,

"includes texts."

MR. ALBERTI:  Yeah.  I would note that in 24 that is dependent on 13, and 13 requires in the preamble that the communication be --

THE COURT:  Real-time.

MR. ALBERTI:  -- real-time.  So we would not object to -- in that context it would be real-time.

THE COURT:  Well, so it appears in '921 text is always real-time.  It's either -- it either says "real-time text" --

MR. ALBERTI:  Right.

THE COURT:  -- or it is part of Claim 13, which is a system for real-time communications.

MR. ALBERTI:  Correct.

THE COURT:  So you don't have to add the words "real-time."  It's already there.

So then the only question is in claim '470.  And your argument is that, yeah, it's got to be real-time in data conferencing, part of a shared window, but that's already encompassed by the data conferencing limitation.

And 21 is really the broadest.  Claim 21 of the '470 is the broadest use of "text."  In every other context it's either expressly or implicitly real-time texts, something going on, but your position is 21 seems different.  It doesn't require that.

MR. ALBERTI:  Yeah.  I would also note in Claim 50, it also does not have the real-time requirement.

So in those two claims, it doesn't.  In the other claims, it most clearly does.

THE COURT:  You have the doctrine of claim differentiation to help you with Claim 34 because it says "real-time text" -- well, sort of.  That modifies 29.  That's dependent on 29, which doesn't even say anything about text in 29 itself.

But the fact that it appears in the same patent when it's meant to be real-time, the inventor used real-time and otherwise didn't.

So it seems to me, it boils down to the question:  Does this invention, the '470, encompass a situation which was posited by Pragmatus; that is, the communication can include text messages between the participants or some kind of emailing or something else that's going on that's not synchronized, bidirectional and -- and bidirectional.

MR. WHITE:  I think as part -- when you look at an email, I think we have to look at the size.  I don't think that's part of the same communication.

When you look at the patent, the only explanation or description that you'll see is in connection with the sharing of the -- in connection with the data conferencing.  So you've got text annotations being done on top of data conferencing

communications.

And I think when you look at what's described, it has to be -- bidirectional has to be real-time. It has to be both ways. That's the only thing you'll see in the specification for that.

THE COURT: Well, that's what it boils down to. I think at the time argument here is that there can be -- the claim language allows there to be text communications outside the data conferencing context. And that seems to be the key. And you say no, and he says yes. Okay. All right. I understand that.

Let me move to the other big question about service programs and indefiniteness, which is kind of a major issue I'm sensing here.

What is a service program? What's an example of that and how is that different from a collaborative initiation program?

MR. ALBERTI: A service program would be a program that performs a service in the invention that's described in the services available on a work station. I'm pointing now to the '470 patent at Column 18, Lines 63 through 67.

It says right here very clearly:

"...the types of services available on that work station (e.g., video conferencing, data conferencing, telephony, et cetera) and other relevant initiation information."

So when the patent is talking about services provided on a work station, clearly, we're in the context of computer systems here. So computers provide services using programs. And the services discussed here are, again, all of these types of communications.

So the collaboration initiator is what would set up the actual communication, put the individuals -- you know, connect the individuals. The actual ability to transfer, you know, perform the actual video conferencing, data conferencing and telephony, would be the services, the different services.

**THE COURT:** You said Column 8?

**MR. ALBERTI:** 18.

**THE COURT:** Oh, 18.

**MR. ALBERTI:** Yes.

**THE COURT:** I'm sorry.

**MR. ALBERTI:** So in Column 18 we see here --

**THE COURT:** Of the '470?

**MR. ALBERTI:** Right.

**THE COURT:** That's where the word "services" appears.

**MR. ALBERTI:** Right. So what the collaboration initiator is doing is it's -- it's the one that's basically setting up the call among the participants. And one of the things that it does is it sends information indicating the location of the user and the types of services available on the work station.

So when we're talking about services, we're saying what capabilities are provided on that workstation?  Can this workstation do video?  Can it run data conferencing?  Can it do telephony?

If you'll recall, there is some discussion in the patent about, for example, a wireless embodiment where not all services are available because of the fact that it's just a mobile computer at the time, didn't have all of the same capabilities that mobile computers do now.

So when we're talking about the actual ability to run these types of services -- video conferencing, data conferencing, telephony -- the actual running of those programs on the workstation itself, those would be run by service programs.

"Program" is, of course, not a mysterious word in the art. Any person of ordinary skill in the art would have no trouble with that.  And a person of ordinary skill in the art looking at this patent specification would see, okay, when the patent is talking about services, it's talking about these abilities that are capable on a workstation.  So, of course, workstation is computer.  It can be done by programs.  Hence, we have the term "service programs."

THE COURT:  All right.  So if "service programs" is defined in terms of programs that provide the services as that term is utilized in Column 18, Lines 63 through 67, would there

be -- you may not agree with that, but would there still be an indefiniteness problem?

**MR. WHITE:** I think there is, your Honor.

First of all, it's not clear that's what it means. First of all, the word "service program" doesn't appear anywhere. So Mr. Alberti is trying to guess, as we all have, to see what that means.

The bigger issue when you look at the claim, it recites a service program. What does it do in the claim? I mean, if you look at the '921, it's the first limitation: "One or more service programs." What is that? What does it do? Where --

**THE COURT:** Well, in that regard why can't you look for -- we know what program is, that's not a big deal. The question is what's a service program. The term "service" describes the kinds of services that are available on a workstation, whether it be video capability, telephony capability, et cetera, et cetera.

**MR. WHITE:** Is it the whole list? Is it any one of those? I mean, we have no idea what that's meant to cover.

**THE COURT:** Well, indefiniteness is a pretty high standard.

**MR. WHITE:** Understood, your Honor.

**THE COURT:** It has to be insolubly ambiguous. And here we're talking about -- if it is defined to mean programs which enable the kinds of services that can be performed by a

workstation, and you give examples of those kinds of things, I'm not sure that's insolubly ambiguous.

MR. WHITE:  Again, that's sort of a leap to get to that point as to what that means.  When it says "services available," that's the only reference anywhere that we've seen.  So --

THE COURT:  That's not a term in the art.

MR. WHITE:  That's correct.

THE COURT:  "Service."

So you have to look -- is there another source, other than this one, these five lines in Column 18 that gives us some assurance that that's what "service" would -- as used by the term "service program" means?

MR. BELLOLI:  Well, I think that's the most -- that's the most evident one, when they're talking about services.

And I don't -- I disagree that a person of ordinary skill in the art would not understand what a service is in the context of this patent.

As you noted, your Honor, it's a very high standard and the recent *El Commerce* case that we cited in our brief basically said very clearly that, you know, attorney argument is not evidence when you're talking about indefiniteness.  You need a person of ordinary skill in the art to render that opinion.

And here we don't -- we don't have that, but we do have a

teaching of what services are on the workstation.  We know that those workstations are computers.  They run programs.  It's -- it doesn't seem like a big leap to me.  Service program is a program that performs one of these services on the workstation.

**THE COURT:**  And will the *Nautilus* case have any bearing, the Supreme Court's impending decision, or do you think that's going to be pretty --

**MR. ALBERTI:**  I think that's a different issue.

**THE COURT:**  All right.  Let me ask you:  Some of the other disputes center around this question about whether it has to be -- addressing, et cetera, et cetera.  It has to have sort of a physical location aspect to it as opposed to a network location.

**MR. ALBERTI:**  I'll turn it over to my colleague.

**THE COURT:**  All right.

**MR. BELLOLI:**  Yeah.  I mean, I think the dispute can be put a little bit more succinctly than even the parties' constructions put it.

A network location necessarily corresponds to a physical location.  What we don't want Yahoo! doing is after you get a construction rendered on addressing information saying that that information can't be an IP address.  Because an IP address is fundamentally what is considered by the patent as the address of the device, and that's how it's used with wireless devices.  How do you find that device?  You use the IP address.

So if defendants -- or defendant was willing to concede that the physical location encompasses an IP address, then their construction is actually fine.  But we don't think that's where they're going and, in fact, we're pretty sure they are not.

So, really, what it really boils down to is an IP address covered by addressing information.  Again, we can walk through places in the patent where that's disclosed, but what we think they are going to say is, no, it has to be an exact physical location, like, this podium and only this podium.  And they are going to say that based upon what happened in a reexamination based on an analogy that was given.

An analogy is not a definition.  We had Easter yesterday, and Easter and Christmas are alike.  Easter is like Christmas in that they are both Christian holidays, but they're for very different reasons.

An IP address is certainly like a home address in that it refers to a place in the network, but it doesn't necessarily mean, you know, this podium and only this podium.

One of the embodiments is a guy in Mexico on his computer and he's -- an IP address is being used to determine where he is.

If they were willing to concede that an IP address is encompassed by a physical, their construction, there is no dispute.

**THE COURT:** So if it read "physical location," sort of, comma, "including IP address," or something like that?

**MR. BELLOLI:** We would be totally fine with it.

**THE COURT:** That's the question.

**MR. WHITE:** Yeah. And if you can switch over to our slides?

I think that's the exact opposite of what this claim means in view of what they said to the Patent Office. So an IP address is not a physical address. It's a virtual address that's stored on a network somewhere. It's a network location address. That's why they are trying to get that definition.

They cannot go back and recapture something that they gave up in order to secure these claims, your Honor. That's a fundamental tenet of patent law.

**THE COURT:** Before we look at the disclaimer estoppel kind of notion, let me just ask generally: Why in this -- when you -- again, you look at the specifications, the background, the abstract summary. Why -- I guess I don't understand why the limitation? Why would addressing the information have to mean only the physical address? What's accomplished by that? I don't understand.

**MR. WHITE:** What's accomplished by that is that's what they had to tell the Patent Office to get them to allow the claims.

I agree with you. If you look at the specification, it's

broader than that.  But you can limit yourself during prosecution, during subsequent issues like a reexamination.

And if you look at what the Patent Office said, and I think this is important, they said that -- they interpreted it broadly.  So, and this is an issue that came up, too, is what's the proper rules.  The Patent Office uses the broadest reasonable construction.  This Court has to be a little bit more specific and can't use the broadest reasonable construction.  So that's one thing to remember.

The Patent Office said the broadest reasonable construction is the physical location.

**THE COURT:**  So their broadest construction is the narrowest interpretation.

**MR. WHITE:**  Correct.

**THE COURT:**  You can't go any broader than that.

**MR. WHITE:**  Exactly.  You can't go any broader.  That exactly what Pragmatus is doing.

So they say it's a different standard.  We agree it's a different standard, but it does not allow them to adopt their construction based on their own attorney arguments to the Patent Office.

Again, this is an issue of public policy.  Anybody who is accused of infringing these patents is presumed to be able to look at the public record, see what these claims cover and rely upon that.  When you have statements, unmistakable statements

like this, and a holding from the Patent Office that says this is what the broadest this claim can mean, you can't now walk away from that.

And this is important, too, because if you look at that decision, and we attached to it some of on our papers, the art that they were trying to get over was using a telephone number. And the Patent Office said -- or the patentee said:  You know, that's not what we're claiming.  We're not claiming a telephone number.  You can get information.  You can kind of back it into something.  We're claiming a physical location.

So I would just argue that a virtual network location, as they are trying to claim, is much more like a telephone number than it is anything else.  And so they can't just walk away from that, your Honor, and recapture things that they gave up.

**THE COURT:**  Well, there were statements that were made during the PTAB proceeding in which it sounded like Pragmatus was arguing that you need to direct information to a destination computer and that that -- you have to be able to identify the device.  And it might be, to use an example, a Mac address or software or an internet address.  They did say that.

**MR. WHITE:**  That's right.

**THE COURT:**  It's only in this colloquy with Judge Gianetti that this analogy comes up to about physical address.  Correct?  That's the key passage you're talking about?

**MR. WHITE:**  That's right.  And that's what the Patent

Office relied upon and put in their definition.

THE COURT:  And your argument is that that was simply by way of analogy and not meant to be a clear disavowal of the scope.

MR. BELLOLI:  And one thing further, your Honor.  So we can look at it separating three different things.

So the hard core physical address, I'll call it.  You know, this podium or this house is fixed at these coordinates is one way, which is the way they are trying to read it.

Then there would be another way, which is the IP address, which is the physical location within the network, because it always corresponds to a physical location.  But a telephone number itself doesn't correspond to a physical location, because it just corresponds to -- you don't know by making a call where that person is, but you know by having the IP address where that person is.

So physical is encompassed -- the physical aspect is encompassed by an IP address, but it's not by a telephone number.  And that's the difference that can be drawn there.

MR. WHITE:  And, your Honor, I would tell you that an IP address, you cannot -- that does not tell you physically where somebody is located.  You cannot tell from an IP address the address you're located at, where you're at.  They may have an idea of a vicinity like you're in kind of like an area code, but you cannot determine a specific physical location based on

an IP address alone.

THE COURT:  If you're on your mobile device and you're not using wi-fi and you're going through the telephone, Verizon for instance, what is the IP -- is there an IP address associated with that telephone, or is it associated with the tower?  What is the IP address in that situation?

MR. BELLOLI:  You're not using wi-fi?

THE COURT:  No, you're just --

MR. BELLOLI:  Just using the Verizon network or AT&T?

THE COURT:  Yeah.

MR. BELLOLI:  I honestly do not know, your Honor.

MR. WHITE:  There is no IP address in that situation, your Honor.

MR. BELLOLI:  Just the telephone number, I guess, then.  So that's kind of the difference that we're saying.

I feel like counsel actually just admitted that it does correspond to a physical address because he just said, you know, you would know within a zip code.  I mean, you would know based on the IP address if someone was in the United States or outside of the United States or within, you know, San Francisco County versus Santa Barbara County.

So then, really, what they are admitting they are trying to do is they are trying to narrow physical location down to a coordinate, a very specific coordinate address and not just, you know, an area.

But we know how wireless devices work.  They work through a router.  So if I have, like -- I mean, I feel like they are saying if I have my computer here and I was having a conference with your Honor, and then I had the same conference while the computer is still working from out there -- you know, you're at a remote location -- they're saying that's not the same physical address.  That's really not what these patents are talking about.

MR. WHITE:  And if they think an IP address is a physical location, then they should have no problem with our definition and let them argue it for infringement purposes.

THE COURT:  What does it mean "physical location"?  Because it's really a question of degree.  Do you mean within a certain area, a defined block or zip code?  Does it mean within the house?  Does it mean within the room within the house?

MR. WHITE:  I think it's got to be very precise based on their analogy.  As long as you know physically where somebody is at, you've got to know exactly where they are located, you've got their physical location.

Apart from that, you can't just know on a network.  Hey, this person may be connected to this server.

MR. BELLOLI:  Your Honor, I think I've got the last nail on this one.

Counsel said that if you take away the reexam, the patent clearly covers something broader, like the IP address.  And

they are saying it was disclaimed.  IP addresses were disclaimed by the analogy.

But if you look at Page 40 of the reexam, counsel argued that it could be an IP address and current ITC IP address network.  So in making the analogy, they weren't disclaiming IP addresses.

I actually have the page here, if your Honor would like.  I don't remember what exhibit this was.

THE COURT:  Do you have that?  I can look at it.

MR. BELLOLI:  It's Docket 42-4, Page 42.

THE COURT:  Page 42?

MR. BELLOLI:  Yeah.  But the actual page number is 40 on the bottom.  I have a copy if you want me to around this up?

THE COURT:  Can I just take a look at that?

(Whereupon document was tendered to the Court.)

MR. BELLOLI:  So, again, you know, hard core physical address, very specific.  IP address, you know, still corresponding to a physical location.  Telephone number, not at all corresponding to a physical location unless you're talking about a land line, but we're talking about wireless devices here.  So that's the distinction that's getting made there.

MR. WHITE:  And I'm curious as to why we're talking about wireless devices now because this whole patent is primarily devoted to a landline, hard wire system.  There is a passing reference to a wireless, but to suggest that this

patent is all about wireless communications I think is way off base.

THE COURT:  Well, it does make reference to wireless routers.

MR. WHITE:  It makes one reference.  The vast majority of the specification --

THE COURT:  But that suggests that, you know, why wouldn't it encompass something that's connected by a router?

MR. WHITE:  I'm not saying it can't encompass that, but I think the overwhelming majority of the specification is not directed to wireless.

THE COURT:  Would there be a reason to have disclaimed anything broader than a physical address in order to distinguish prior art or save the patent in any way?

MR. WHITE:  Yeah.  I think about the -- I mean, we just talked about the telephone number.  I mean, you can use the telephone book.  You can back a telephone number into an address.  And they were saying that's not enough.  Right?

I mean, that's one way that you could do it, to try to get to where somebody is at and they said no.  Guessing and speculation is not enough.  We need to know the physical location.  We're not talking about virtual, someplace on the network.  The prior art talked about these virtual addresses.  They had information about different things as to where computers could be located on networks.

The Patent Office was not going to allow them to have those claims unless they made some argument to get around that. So they had to say it's the physical location that's necessary.

THE COURT:  Where in the record -- maybe give me some cites where you think that the purported disavowal of the scope and limiting it to only physical addresses was necessary in order to distinguish prior art?

MR. WHITE:  I think probably the best is on Page 12 of the PTAB decision that's attached.  And there they are talking about telephone numbers, saying that that's not sufficient to identify a physical location.

And that's why the prior art system -- these patents were patents that were patentable over the prior art system.

THE COURT:  I'm not sure I understand why -- why they had to disavow IP addresses to get around prior art, which had to do with telephone numbers.

MR. WHITE:  I think anything that had any sort of network address, right?

So the prior art system that had information about a user's phone number, where they are coming from.  So think about -- we talked about this before.  You've got information. You have to keep track of where a user is at.

So what do these patents do?  They talk about when you log into a system -- and we talked about this during the tutorial -- the computer is going to store information about

who the user is and how can I locate them?  What information do I have about them?

You had a piece of prior art.  It was an AOL dial-up system, where folks would dial into a system using the old dial-up.  So the system knew the user's telephone number, where they were calling from.

The Patent Office said:  When I look at this, I'm associating a user with telephone information.  That's addressing information.  I can locate that person using that addressing information.

And Pragmatus, the patentee, said:  No, no, no.  That's different.  You only have a telephone number.  That's not enough, not enough detail to get you the specific physical location, which is what our claims require.  So, therefore, ignore this AOL dial-up system, which only had a telephone number.  It wasn't specific enough to give you the physical location.  That's what we require.  Therefore, our claims should be allowed.

THE COURT:  Why wouldn't an invention that uses IP addresses to locate others be distinguishable from one that relied upon telephone numbers?  I mean, that's different.

Why would you have to go to the extreme of saying -- I guess I'm not seeing a connect between the need to disavow IP addresses and the need to distinguish telephone numbers.

MR. WHITE:  So the first thing is they didn't claim

IP addresses.  They didn't disclose or discuss IP addresses in the specification.  So that's the first issue, is we're talking about IP addresses, but the figures that Pragmatus showed you during the tutorial were not from the patent.  They showed you a router with, you know, this dot --  .81, .82, .83.  None of that is from the patent.  They are trying to bring that in.

That's my first response, is the claims don't talk about the IP addresses.  The spec doesn't talk about that level of detail.

The second is that the broader issue is you're talking about a physical location versus some sort of network location, which is what their definition is.  A telephone number in a dial-up situation where you're dialing in is almost identical to an IP address.  It's a virtual location.  Doesn't tell you exactly where somebody is at.  It's a way to find somebody by sending some information into a network.  And they had to disclaim that because that was what the prior art was.

And so we believe that they have given up any of these ideas of virtual addresses, network locations.  When they said physical location and the Patent Office accepted that and included it in the decision, physical location has to stick.  And that has to be to the exclusion of any of these virtual locations, whether it be a network address or some other type of virtual location.  It's got to be a physical location.

THE COURT:  All right.  Your comments?

**MR. BELLOLI:**  I feel like counsel has changed his arguments on the fly.

First, he was saying, yes, the patent covers wireless, which would necessarily be IP addresses.  And, again, IP addresses are talked about certainly implicitly -- well, one, by having wireless devices; and, two, in the '470 patent at Column 8, Lines 38 to 44 where it talks about the TCP/IP network protocol.  It's talking about IP protocols.  And --

**THE COURT:**  What's the page number?

**MR. BELLOLI:**  Page -- or, sorry.  Column 8, Lines 38 to 44.  It talks about the network interface cards.  You know, Fig. 18-a, which have IP addresses assigned to them.

So it's in there.  And he conceded it at first, but I feel like he flip-flopped on that one.

Then again he says:  Disclaimer, disclaimer, disclaimer. Yeah, telephone numbers were disclaimed because they don't correspond to a physical address.

But in the paper I handed up to your Honor, same attorney saying:  Yes, it's analogous to a physical location -- or, I'm sorry, an address, a home address, but he's saying there it also encompasses an IP address.  So if you're saying it encompasses an IP address in your argument, you're not disclaiming it.

**THE COURT:**  All right.  What about your response -- well, any further comment about the disclaimer?  Any other

cites that I should be pointed to?

      **MR. BELLOLI:**  That's the big one.  We think -- even if there wasn't that statement by counsel saying that IP addresses are part of what's covered by the -- by addressing information, even if that wasn't there, that analogy is not a sufficient disclaimer because telephone numbers are not analogous to physical addresses or IP addresses, which do have a physical component to them.  Because you're talking about where this device is within the system, versus a telephone number which, when it's a mobile device, could be anywhere and doesn't tell you anything about where they are.

    I mean, I get calls -- my sister has had her -- I grew up in Michigan.  She has had her Michigan cell phone number ever since she moved to San Diego 10 years ago.  So when I called her in Michigan, I called her in San Diego every single time.

      **MR. WHITE:**  The last thing I would say, your Honor, if he believes the IP address is a physical -- it captures the physical location, they should have no problem adopting our interpretation and then let them argue that for claim infringement.

      **MR. BELLOLI:**  Well, see, but that's the thing.  Your Honor is here to dissolve disputes of law.  Whether this covers an IP address is a pure question of law.  And we think if you want to say physical address, you know, kind of like you said at the beginning, "including, for example, an IP address,"

we're fine with it.

But we're not putting -- that's not a question of fact for a jury. That's a question for your Honor. And I think that's what they are trying to skirt with this, is that they want to go argue that to the jury.

**THE COURT:** I will resolve that and then we'll take everything else under submission. I think the other stuff I have a handle on.

What I want to do now is talk a little bit about case management. In particular, I understand that until I get out an order, we're uncertain about the timing of everything.

But I do want to raise with you the question about further ADR. I know you went to Judge Grewal before and were not able to reach a resolution. But if I can get a claim construction order out within a reasonable amount of time, next couple of weeks, I would hope that would be an opportunity to go back to either Judge Grewal, or whatever you think is a proper venue, because by then you'll have pretty good -- some more data points.

**MR. BELLOLI:** We believe it would be, your Honor. And I think if -- you know, 30 days or 60 days from when the claim construction order is out would be a good time frame to set ADR for. Obviously, Yahoo! is going to have an opinion as well.

**MR. WHITE:** I neglected to introduce David Brightman,

who is in-house counsel for Yahoo!, your Honor.  So I was just speaking with him briefly.

I think we would be happy to revisit the issue.  I'm not sure if ordering another round happen be the right way to go yet, but I think after the claim construction order comes out would be the right time to at least revisit whether it makes sense to do that.

**THE COURT:**  And, you know, also whether that's your -- you want to continue to pursue it in that venue or some other venue, that will be up to the parties, whatever is the most --

**MR. BELLOLI:**  Parties can talk directly or, certainly, we're comfortable with the magistrate, who we thought was very good.

**MR. WHITE:**  I don't think we had any issues with the magistrate judge.  So in terms of forum, I don't think there will be an issue on that.

**THE COURT:**  All right.  Well, what I will do is I'm hoping to get out a claim construction order reasonably quickly and I'll set a status conference date to follow shortly thereafter.

At that point that's when I'm going to set trial dates and everything else in the rest of the course of this litigation. I do intend to put this on the fast track once we get out of the starting gate here.

All right?

MR. BELLOLI:  Thank you, your Honor.

MR. ALBERTI:  Thank you, your Honor.

THE COURT:  Great.

MR. WHITE:  Thank you, your Honor.

(Proceedings adjourned.)

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

### CERTIFICATE OF OFFICIAL REPORTER


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


*Debra L. Pas*
_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Tuesday, May 6, 2014

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*