UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PRAGMATUS AV, LLC,                          No. C-13-1176 EMC

        Plaintiff,

    v.                                          **CLAIM CONSTRUCTION ORDER**

YAHOO! INC.,

        Defendant.

_____/

    Plaintiff Pragmatus AV, LLC has filed suit against Defendant Yahoo! Inc. for infringement of two patents, namely, the '470 and '921 patents.  The patents share the same specification.  Both patents concern real-time communication between plural users.

    Currently pending before the Court are the parties' claim construction briefs.  For the reasons discussed below, the Court adopts the following constructions regarding the disputed terms.

**I.    DISCUSSION**

A.    <u>Legal Standard</u>

    Claim construction is a question of law to be determined by the Court.  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) ("hold[ing] that in a case tried to a jury, the court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim").  "The purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'"  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

> Words of a claim are generally given their ordinary and customary meaning, which is the meaning a term would have to a person of ordinary skill in the art after reviewing the intrinsic record at the time of the invention.  "In some cases, the ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."  However, in many cases, the meaning of a claim term as understood by persons of skill in the art is not readily apparent.

*Id.*

> Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." Those sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005).

The Federal Circuit has underscored that the specification of a patent "'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Id.*; *see also id.* at 1317-19 (noting that "extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence").  However, the Federal Circuit has also cautioned that, "'[w]hile claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims.'"  *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1354 (Fed. Cir. 2012).  In fact, "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a claim intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'"  *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004).

///

///

///

///

2

United States District Court

For the Northern District of California

B.   <u>"maintaining . . . [an] association"[1]</u>

| Pragmatus | Yahoo | Court |
|---|---|---|
| maintaining . . . a relationship | storing a persistent relationship or link; <br><br> or <br><br> storing a persistent relationship (see Resp. Br. at 6 (stating that Yahoo is willing to drop "link")) | maintaining . . . a relationship |

For purposes of claim construction, claim 1 of the '470 patent is a representative claim for the term "maintaining . . . [an] association."  Claim 1 of the '470 patent provides in relevant part as follows:

> **1.**  A method comprising:
>
> *maintaining a first association* between a first user and corresponding addressing information of a first communication device used by the first user to log in;
>
> *maintaining a second association* between a second user and corresponding addressing information of a second communication device used by the second user to log in, wherein the second communication device is separated from the first communication device by a wide area network;
>
> wherein the first and second associations are dynamically changeable by keeping track of client programs at the respective communication devices so that the first and second users, if logged in, can be found no matter where they are located . . . .

'470 patent, claim 1 (emphasis added).

The parties' basic dispute here is whether "maintaining . . . [an] association" has a "store" and/or "persist" requirement.  Yahoo argues that it does; Pragmatus argues to the contrary.

Yahoo's contention that there is a "persistent" association is problematic.  According to Yahoo, "persist" is appropriate because the term "maintain" inherently has a time component to it,

---

[1] '470 patent: claims 1, 2, 16, 17, 29, 30, 43, 44.

'921 patent: claims 1, 3, 13, 17, 25, 33.

3

1   as supported by dictionary definitions of the term.  *See, e.g.*, Patariu Decl., Ex. E (Merriam

2   Webster's Collegiate Dictionary, 10th ed. (1995)) (defining "maintain" as, *inter alia*, "to keep in an

3   existing state (as of repair, efficiency, or validity)," "to preserve from failure or decline," and "to

4   continue or persevere in").  While the term "maintain" does have a time component to it, "persist"

5   seems to take that time component to an extreme; "persist" suggests that things cannot be changed

6   and will continue indefinitely.  As Pragmatus contends, that is contrary to the language of claim 1

7   which states that "the first and second associations are dynamically changeable."  '470 patent, claim

8   1.  Furthermore, Yahoo's responsive brief essentially admits that the association simply lasts "for a

9   period of time" – not indefinitely.  *See* Resp. Br. at 6 ("The claims require that the association be

10  stored *for a period of time* so that other users can be found and collaborated with 'no matter where

11  they are located.'") (emphasis added).

12          As for the "store" requirement, here, the Court is more sympathetic to Yahoo's position.

13  Parts of the specification do support the idea of storage – which makes sense because, in order for an

14  association (between a user of a communication device and addressing information of that device) to

15  be maintained, that information should be kept or stored somewhere.  For example:

16  •   In the section titled "Basic Two-Party Videoconferencing," the specification notes as

17          follows: "When a caller initiates a call (e.g., by selecting a user from the graphical rolodex

18          and clicking the call button or by double-clicking the face icon of the callee on the quick-dial

19          panel), the caller's Collaboration Initiator responds by identifying the selected user and

20          requesting that user's address from Directory Service **66**, as indicated by (**2**) in FIG. **23**.

21          Directory Service **66** *looks up the callee's address in the directory database*, as indicated by

22          (**3**) in FIG. **23**, and then returns it to the caller's Collaboration Initiator, as illustrated by (**4**)

23          in FIG. **23**."  '470 patent, col. 21:66-22:8 (emphasis added).

24  •   In the abstract, the following statement is included: "Further, the method comprises

25          *maintaining service records for at least the first and second logged in users*, the service

26          records including user identification information and an associated location where each user

27          is logged in."  '470 patent, abstract (emphasis added).

28

**United States District Court**
For the Northern District of California

Furthermore, in its reply brief, Pragmatus does not really take issue with the concept of storage per se; rather, its real beef is with the notion that the storage must be persistent or permanent instead of temporary. *See, e.g.*, Reply at 1 (stating that "nothing in the specification or claims requires that this relationship be 'stored' in persistent storage, such as a hard disk, just that it be maintained during communication between the users"; also noting that "databases and the data stored within them are often *temporary – not persistent*").

Nevertheless, the Court finds that the concept of "store" is implicit in the term "maintain." The Court therefore deems it unnecessary to use the word "storing" in its construction.

Because the Court rejects both Yahoo's proposal of "storing" and "persistent," it simply construes the phrase "maintaining . . . [an] association" as maintaining a relationship.

C.    "addressing information"[2]

| Pragmatus | Yahoo | Court |
|---|---|---|
| network location information | physical location | network location information |

Similar to above, claim 1 of the '470 patent is a representative claim for the term "addressing information." Claim 1 of the '470 patent provides in relevant part as follows:

> **1.** A method comprising:
>
> maintaining a first association between a first user and corresponding *addressing information* of a first communication device used by the first user to log in;
>
> maintaining a second association between a second user and corresponding *addressing information* of a second communication device used by the second user to log in, wherein the second communication device is separated from the first communicaiton device by a wide area network;
>
> wherein the first and second associations are dynamically changeable by keeping track of client programs at the respective communication devices so that the first and second users, if logged in, can be found no matter where they are located . . . .

---

[2] '470 patent: claims 1, 16, 29, 43.

'921 patent: claims 1, 13, 25.

5

United States District Court
For the Northern District of California

1  '470 patent, claim 1 (emphasis added).

2         According to Yahoo, "addressing information" means physical location.  According to

3  Pragmatus, "'network location information' . . . is more technically precise and accurate" because,

4  "[a]lthough network locations will inevitably correspond to physical locations, . . . it is the network

5  location that is used to make and receive calls."  Reply at 2-3.  At the hearing, Pragmatus stated that

6  it would not object to Yahoo's construction so long as it was understood that an IP address could be

7  a physical location – *i.e.*, because, even if a virtual address, an IP address ultimately corresponds to a

8  physical location.

9         In its papers, Yahoo argues that the Court should reject Pragmatus's construction because

10  "nowhere in the specification does it state that 'addressing information' is 'network location

11  information.'"  Resp. Br. at 7.  But, at the hearing, Yahoo also admitted that nowhere in the

12  specification is "addressing information" limited to a physical location either.  Indeed, the fact that a

13  communication device can be a wireless device makes it questionable whether there can be a precise

14  physical location for that device, at least a permanent one.  *See, e.g.*, '470 patent, claim 5 (covering

15  "[t]he method of claim **1**, wherein the first communication device is a wireless device").  Given the

16  nature of the invention, which facilitates connectivity among devices through the networks,

17  including the Internet, and the fact that the invention acknowledges wireless devices, limiting

18  "addressing information" to physical location rather than network location information makes no

19  functional sense.  Nor is such a limitation found in the claim language or specification.

20         Yahoo nonetheless argues that "addressing information" must mean a physical location

21  because of a 2013 decision issued by the Patent Trial and Appeal Board ("PTAB") during a

22  reexamination proceeding involving the '470 patent.  *See* Docket No. 43-5 (Patariu Decl. ¶ 5 & Ex.

23  D) (decision).  The relevant part of the PTAB decision is as follows:

24                We begin our analysis by first considering the scope and
              meaning of the claim term "addressing information," which must be
25            given its broadest reasonable interpretation consistent with the
              disclosure in the '470 patent.  *See In re Trans Texas Holdings Corp.*,
26            498 F.3d 1290, 1298 (Fed. Cir. 2007); *see also In re Yamamoto*, 740
              F.2d 1569, 1571 (Fed. Cir. 1984) (during a reexamination proceeding,
27            claims are given their broadest reasonable interpretation consistent
              with the specification and limitations from the specification are not
28            read into the claims).  As support for the disputed claim term, both

United States District Court

For the Northern District of California

Appellant [Facebook] and Respondent [Pragmatus] direct us to column 5, line 60 through column 6, line 13; column 21, lines 15-17; and column 22, lines 13-16.4 App. Br. at 9; Respondent Br. at 10.  The relevant portions of the '470 Specification are reproduced below:

- The '470 Specification discloses "maintaining service records for at least the first and second logged in users, the service records including user identification information and an associated location where each user is logged in."  Spec. 6:1-4.

- The '470 Specification discloses that "service records are entered into the Service Server's service database. The service database thus keeps track of the location of client programs and the types of collaborative sessions in which they can participate.  This allows the Collaboration Initiator to find collaboration participants no matter where they are located."  Spec. 21: 11-17.

- The '470 Specification discloses that "[t]his service record identifies the location of the callee's Collaboration Initiator as well as the network ports that the callee is connected to."  Spec. 22:13-16.

Upon reviewing the relevant portions of the '470 Specification, we conclude that the claim term "addressing information" may be broadly, but reasonably construed as the physical location of a communication device used by a prospective user to log in.  Moreover, during the oral argument, Respondent [Pragmatus] confirmed that address information constitutes a physical location.  Hearing Tr. at 30 (*see, e.g.*, Respondent analogizes the address of a house to the claimed "addressing information" of a device).  That confirmation is consistent with our construction of the claim term "addressing information."

Docket No. 43-5 (PTAB Decision at 9-10).  According to Yahoo, because the PTAB concluded that the broadest definition of the term "addressing information" is physical location, network location information (such as an IP address) – which is broader in meaning than physical location – is necessarily an inappropriate construction.

The problem for Yahoo is that this Court owes no deference to the PTAB's claim construction done as part of an inter partes review.  *See Rensselaer Polytechnic Inst. v. Apple Inc.*, No. 1:13-CV-0633 (DEP), 2014 U.S. Dist. LEXIS 5186, at *29 (N.D.N.Y. Jan. 15, 2014) (in case decided after America Invents Act ("AIA") went into effect, stating that "[t]he focus of the PTAB in [inter partes review] is upon validity; even if an IPR is conducted, that administrative body will not engage in claim construction[;] [i]n making its determination, the PTAB is mandated to accord claim terms their broadest possible construction"); *cf. SRAM Corp. v. AD-II Eng'g Inc.*, 465 F.3d 1351,

United States District Court
For the Northern District of California

1359 (Fed. Cir. 2006) (in case decided before AIA went into effect, stating that "this court is not bound by the PTO's claim interpretation [in inter partes reexamination] because we review claim construction de novo").[3]

Ultimately, what is important here is not what the PTAB said about the claim term "addressing information" but rather *what Pragmatus said* about the term in the proceedings before the PTAB and whether any disavowal or estoppel argument may be asserted based thereon. Under Federal Circuit law, comments made by a patent holder during inter partes reexamination proceedings can limit claim scope. *See Grober v. Mako Prods.*, 686 F.3d 1335, 1341 (Fed. Cir. 2012) ("When a patentee makes a 'clear and unmistakable disavowal of scope during prosecution,' a claim's scope may be narrowed under the doctrine of prosecution disclaimer. Statements made during reexamination can also be considered in accordance with this doctrine. . . . [T]he doctrine of prosecution disclaimer only applies to unambiguous disavowals."). The same should be true now that inter partes review, rather than inter partes reexamination, is in effect. *See note 3, supra.*

During the PTAB proceeding, Pragmatus stated, *inter alia*, with respect to "addressing information":

> We agree that the addressing information can be expressed in many forms. And really need only allow the system to direct information to the destination computer. That is what the phrase, addressing information means.
>
> However there are additional words in these claims. There's a specific type of addressing information and it is addressing information of the device used by the user to log in.
>
> Those words have to mean something under the doctrines of claim differentiation. The prior art uses information such as port addresses of the server and dial-in phone numbers to allow communications but it did not use addressing information of the device.
>
> *Characteristics of the device that allow the device to be identified.* Such as a Mac address, as an example, software on the device, an internet address.

---

[3] "Effective September 16, 2012, the Leahy-Smith America Invents Act ('AIA') amended the *inter partes* reexamination process and renamed it the inter partes review process. The AIA converted the process from an examination to an adjudicative one." *Tas Energy, Inc. v. San Diego Gas & Elec. Co.*, No. 12cv2777-GPC(BGS), 2014 U.S. Dist. LEXIS 26107, at *4 (S.D. Cal. Feb. 26, 2014).

United States District Court

For the Northern District of California

Docket No. 43-4 (Patariu Decl., Ex. C) (Tr. at 24-25) (emphasis added).  None of what Pragmatus stated in this passage suggests that "addressing information" means a physical location.

Moreover, later in the proceeding, Pragmatus indicated that an IP address could be addressing information.

> I think one important feature of the disclosed embodiment in the specification, is that it operated across networks and Wide Area Networks. . . .
>
> Users work stations were accessed through data LAN hubs in the disclosed embodiment.  Now in order to route through a hub and through a Wide Area Network or Local Area Network, *various information of the destination device is generally needed.*
>
> *It could be an IP address and current ITC IP address networks.*  At this time there are many different network architectures being used.  But it was not a simple open connection that someone connected to in this embodiment.
>
> So this system, using the steps of Figure 23, would contact, the user would contact the director server, would look up the addressing information of the communication device used by another user to log in.  Then the system would use that addressing information to enable communication between the users.

Docket No. 43-4 (Patariu Decl., Ex. C) (Tr. at 39-40) (emphasis added); *see also* '470 patent, col. 8:38-44 ("Control of A/V Switching Circuitry **30**, conference bridges **35** and WAN gateway **40** in FIG. **3** is provided by MLAN [multimedia local area network] Server **60** via lines **60***b*, **60***c*, and **60***d*, respectively.  In a preferred embodiment, MLAN Server **60** supports the TCP/IP network protocol suite.  Accordingly, software processes on CMWs [collaborative multimedia workstations] **12** communicate with one another and MLAN Server **60** via MLAN **10** using these protocols.").

Yahoo claims, however, that the following exchange between a PTAB judge (Judge Giannetti) and Pragmatus (Mr. Kaufman, counsel) supports its position:

| JUDGE GIANNETTI: | Can a port be an address information? |
|---|---|
| MR. KAUFMAN: | Can a port be addressing information? |
| JUDGE GIANNETTI: | In a dial-up system, for example, where you dial from a particular port.  Can't that port be an address for the device? |
| MR. KAUFMAN: | A port could be an address for the device of which the port is one. |

**United States District Court**

For the Northern District of California

1 . . . .

2     MR. KAUFMAN:         So a port of the server, for example, I
3                                                     think would fit the definition of
                                                  addressing information of the server.

4 . . . .

5     JUDGE GIANNETTI:     Well let's take your figure.  I'm looking
6     at your chart.  I think it's the next slide
7     where it shows two users logged in to a CompuServe server and one's on one port and the other's on the other.

8     But why can't the port, by which a
9     particular user logged into be an . . . address of the device?

10     MR. KAUFMAN:         Pardon me for really parsing words very
11     carefully here, because it is important.  I would say that these ports can be
12     addressing information of this device, the server.  Because they can be used to locate that server.

13     JUDGE GIANNETTI:     It can be used to locate the device too,
14     can't they?

15     MR. KAUFMAN:         The device that the user uses to log in?

16     JUDGE GIANNETTI:     Right.

17     MR. KAUFMAN:         No they can't.

18     JUDGE GIANNETTI:     Why not?

19     MR. KAUFMAN:         Because that port number there tells us
20     nothing about the device.  The device must reach out to that port by dialing in.

21     JUDGE GIANNETTI:     Once they're dialed in, once they're
22     logged in, if you send a message to that particular port, isn't that addressing it to
23     the device?

    MR. KAUFMAN:         It is addressing it to the server.

24 . . . .

25     MR. KAUFMAN:         [I]t is addressing information.  That can
26     be used to find the device, but it does not tell us anything about, it's not of the
27     device because it's not a characteristic of the device.

28

United States District Court

For the Northern District of California

. . . .

| | | |
|---|---|---|
| JUDGE GIANNETTI: | | Well the device is at one end of the analog phone line and the port is at the other end.  So I'm sending to one end and it's going through the pipe, through the analog line, to the device.  Why am I not addressing the device by sending it to the line? |

MR. KAUFMAN:              Well let me, it's because the system knows nothing about where that device is and has no information.  It's not using addressing information of the device to make the communication.

It [would] be very similar to if I would like to deliver you a holiday card, Judge Giannetti, I don't need to know the address of your house if I just reach out and give it to you right now.

JUDGE GIANNETTI:        What if –

MR. KAUFMAN:              If I want to send it by mail, I have to know the address of your house.

JUDGE GIANNETTI:        What if you send it to a Post Office Box?

MR. KAUFMAN:              I would say that, that is not the address of your house and that there must be some other information to get to your house.

JUDGE GIANNETTI:        But it's my Postal Address.  Isn't that analogous to the port?

MR. KAUFMAN:              It is your postal address, but I'm now talking about, I'm analogizing the house to the device.  And I think that that is reading out the words *of the device*.

We've all agreed that addressing information generally is information sufficient to get from one end to the other.  But it's not *of the device*.

Docket No. 43-4 (Patariu Decl., Ex. C) (Tr. at 25-29) (emphasis added).

But the above colloquy makes clear that Pragmatus was analogizing a house (a "physical location") to a device simply to clarify that addressing information of a device has to be a characteristic *of the device*.  By making this analogy, there was no clear "'clear and unmistakable

11

United States District Court

For the Northern District of California

disavowal of scope'" – *i.e.*, that "addressing information" must mean a physical location.  *Grober v. Mako Prods.*, 686 F.3d at 1341 (Fed. Cir. 2012) (emphasizing that "the doctrine of prosecution disclaimer only applies to unambiguous disavowals").  This is particularly so in light of other comments by Pragmatus quoted above which indicate addressing information is not a physical location.

Finally, the Court notes it is far from clear (based on the record) that Pragmatus needed to disclaim anything but physical location as "addressing information" in order to avoid the prior art. That is, Yahoo has failed to adequately explain why Pragmatus needed to disavow an IP address as "addressing information" in order to avoid prior art when the prior art focused on the use of telephone numbers, which are distinguishable from IP addresses.  *See* Docket No. 43-5 (Patariu Decl., Ex. D) (PTAB Decision at 12) ("[W]e cannot say with certainty . . . that Bowen's disclosure of accessing the CompuServe system by dialing in to a packet-switch network necessarily encompasses maintaining the physical location of a communication device used by a prospective user to log in.  [¶] Moreover, while it may be possible to rely upon the local access numbers associated with Bowen's packet-switch networks . . . to ascertain the physical location of the communication device used by a prospective user to log in to the CompuServe system, those local access numbers, at best, only provides the area code where the user is located.").

Accordingly, the Court rejects Yahoo's proposal that "addressing information" must mean physical location.  Instead, the Court adopts Pragmatus's construction – *i.e.*, network location information," particularly as such a construction is consistent with the comments Pragmatus made to the PTAB.

///

///

///

///

///

///

///

D.    "keeping track of client programs"[4]

| Pragmatus | Yahoo | Court |
|---|---|---|
| keeping track of the location of client programs | receiving and storing the physical location information and communication capabilities from software that controls physical input and output connections | keeping track of the location of client programs |

Similar to above, claim 1 of the '470 patent is a representative claim for the term "keeping track of client programs."  Claim 1 provides in relevant part:

> **1.**  A method comprising:
>
> maintaining a first association between a first user and corresponding addressing information of a first communication device used by the first user to log in;
>
> maintaining a second association between a second user and corresponding addressing information of a second communication device used by the second user to log in, wherein the second communication device is separated from the first communication device by a wide area network;
>
> wherein the first and second associations are dynamically changeable by *keeping track of client programs* at the respective communication devices so that the first and second users, if logged in, can be found no matter where they are located . . . .

'470 patent, claim 1 (emphasis added).

Pragmatus's construction – *i.e.*, keeping track of the *location* of client programs – is supported by the specification for the '470 patent.

> Before client programs can access audio/video resources through the AVNM [Audio Video Network Manager], they must register the collaborative services they provide with the Service Server 69.  Examples of these services indicate "video call," "snapshot sharing," "conference" and "video file sharing."  These service records are entered into the Service Server's service database.  The service database thus *keeps track of the location of client programs* and the types of collaborative sessions in which they can participate.  This

---

[4] '470 patent: claims 1, 16, 29, 43.

'921 patent: claims 1, 13, 25.

13

1    allows the Collaboration Initiator to find collaboration participants no
2    matter where they are located.

3    '470 patent, col. 21:7-17 (emphasis added).  Yahoo argues that it is the *physical* location that is

4    tracked but, as discussed above in conjunction with "addressing information," physical location is

5    not an appropriate limitation.

6         Yahoo protests still that Pragmatus's construction is deficient because it does not define what

7    a client program is or does.  According to Yahoo, there should be language in the construction

8    indicating that client programs "control the physical input and output connections for audio

9    devices."  Resp. Br. at 8.  Yahoo relies on the following part of the specification in support:

10         In response to client program requests, the AVNM provides
11   connectivity between audio/video devices by connecting their ports.
     Connecting ports is achieved by switching one port's physical input
12   connections to the other port's physical output connections (for both
     audio and video) and vice-versa.  Client programs can specify which
13   of the 4 physical connections on its ports should be switched.  This
     allows client programs to establish unidirectional calls (e.g., by
14   specifying that only the port's input connections should be switched
     and not the port's output connection) and audio-only or video-only
15   calls (by specifying audio connections only or video connections
     only").

16   '470 patent, col. 20:59-21:3.  But the fact that client programs "*can* specify which of the 4 physical

17   connections on its ports should be switched" (emphasis added) indicates that Yahoo's language is

18   too strong; the specification does not say the client programs "must" control physical input and

19   output connections.

20        Pragmatus further argues that the *physical* requirement desired by Yahoo is misplaced

21   because

22         the patents-in-suit are not limited to 'physical . . . connections'
     between the communication devices. . . . [T]he patents-in-suit
23   expressly disclose the use of the invention in the context of wireless
     devices and the Internet where no physical connection exists between
24   a caller and callee.  Indeed, Yahoo!'s proposal that a physical
     connection is required has been considered and rejected multiple times
25   by judges in the Northern District of California when analyzing U.S.
     Patent No. 5,896,500, which is related to and shares the same
26   specification as the patents-in-suit.

27   Op. Br. at 8 (citing Docket Nos. 42-4 and-5) (Belloli Decl., Exs. D-E) (orders from Judge Chesney

28   and Judge Patel regarding, *inter alia*, the '500 patent).  Here, the Court does not find Pragmatus's

14

**United States District Court**

For the Northern District of California

1   reliance on the Judge Chesney and Judge Patel orders convincing (*e.g.*, those orders focus on a

2   completely different term, "AV path").  Nonetheless, Yahoo's position remains problematic because

3   the fact that client programs "*can* specify which of the 4 physical connections on its ports should be

4   switched," 470 patent, col. 20:59-21:3 (emphasis added), does not establish that there must always

5   be physical connections.

6         The Court therefore adopts Pragmatus's construction.

7   E.    <u>"active communication"</u>/<u>"existing communication"</u>[5]

| Pragmatus | Yahoo | Court |
|-----------|-------|-------|
| plain and ordinary meaning; no construction necessary | communication where the call handle is in the active state | plain and ordinary meaning |

12         For the terms "active communication" and "existing communication," claims 1 and 13 of the

13   '470 patent are representative claims.  Claim 1 provides:

14       **1.** A method comprising:

15       maintaining a first association between a first user and corresponding
     addressing information of a first communication device used by the
16       first user to log in;

17       maintaining a second association between a second user and
     corresponding addressing information of a second communication
18       device used by the second user to log in, wherein the second
     communication device is separated from the first communication
19       device by a wide area network;

20       wherein the first and second associations are dynamically changeable
     by keeping track of client programs at the respective communication
21       devices so that the first and second users, if logged in, can be found no
     matter where they are located;

22

23         presenting a user interface on a display associated with the first
     communication device, the user interface including at least one of a
     scrollable list of identifiers of a plurality of users and a dial panel of
24       identifiers for at least a subset of users from the scrollable list, wherein
     at least one of the scrollable list and the dial panel includes an
25       identifier for the second user;

26

27        [5] '470 patent: claims 1, 10, 13, 16, 24, 27, 29, 36, 37, 43, 48.

28        '921 patent: claims 1, 6, 7, 13, 21, 22, 25, 30, 31.

if the second user is not logged in, indicating to the first user that the second user is not logged in;

allowing the first user to select from the user interface the identifier of the second user;

in response to the first user selecting the identifier of the second user and if the second user is logged in, using the addressing information of the second communication device to allow communication between the first and second users, the communication being established using either a communication type selected by the first user or a default communication type;

detecting an incoming request for communication, from at least a third user, at the first communication device of the first user during an *active communication* with the second user;

indicating to the first user the third user; and

providing the first user with an option of accepting the incoming request for communication with the third user.

'470 patent, claim 1 (emphasis added).

Claim 13 provides:

**13.**  The method of claim **1**, further comprising allowing the first user to:

select one or more users from among the plurality of users by selecting corresponding identifiers associated with the selected one or more users; and

add the selected one or more users to an *existing communication*.

'470 patent, claim 13 (emphasis added).

The Court rejects Yahoo's proposed construction of "active communication"/"existing communication."  First, Yahoo's construction contains a confusing term itself – *i.e.*, "callhandle." Callhandle appears nowhere in the claims themselves; rather, it is a term that is used in the specification only.

Second, it is true that callhandles are expressly called out in the specification.  For example:

[T]he AVNM [Audio Video Network Manager] manages the switches in the A/V Switching Circuitry **30** in FIG. **3** to provide port-to-port connections in response to connection requests from clients.  *The primary data structure used by the AVNM for managing these connections will be referred to as a callhandle*, which is comprised of a plurality of bits, including state bits.

> Each port-to-port connection managed by the AVNM comprises two callhandles, one associated with each end of the connection. The callhandle at the client port of the connection permits the client to manage the client's end of the connection. The callhandle mode bits determine the current state of the callhandle and which of a port's four switch connections (video in, video out, audio in, audio out) are involved in a call.
>
> AVNM clients send call requests to the AVNM whenever they want to initiate a call. As part of a call request, the client specifies the local service in which the call will be involved, the name of the specific port to use for the call, identifying information as to the callee, and the call mode. In response, the AVNM creates a callhandle of the caller's port.
>
> All callhandles are created in the "idle" state. The AVNM then puts the caller's callhandle in the "active" state. The AVNM next creates a callhandle for the callee and sends it a call event, which places the callee's callhandle in the "ringing" state. When the callee accepts the call, its callhandle is placed in the "active" state, which results in a physical connection between the caller and the callee. Each port can have an arbitrary number of callhandles bound to it, but typically only one of these callhandles can be active at the same time.

'470 patent, col. 22:54-64 (emphasis added). However, the above discussion refers only to the *preferred embodiment* of the invention, *see* '470 patent, col. 6:15-16, and "[a]n accused infringer cannot overcome the plain meaning of a claim term 'simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history.'" *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1369 (Fed. Cir. 2012). Pragmatus did not disavow or disclaim an active/existing communication except through a callhandle in the active state. *See DealerTrack, Inc. v. Huber*, 674 F.3d 1315, 1327 (Fed. Cir. 2012) (stating that "'it is improper to read limitations from a preferred embodiment described in the specification – even if it is the only embodiment – into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited").

Finally, because the meaning of "active/existing communication" is obvious on its face, the Court need not construe the term beyond its plain and ordinary meaning.

///

///

///

///

F.    "indicating"/"indication"[6]

| Pragmatus | Yahoo | Court |
|---|---|---|
| providing notice visually *or* by sound | providing notice visually *and* by sound | providing notice visually and/or by sound |
| a notice provided visually *or* by sound | a notice provided visually *and* by sound | a notice provided visually and/or by sound |

Once again, claim 1 of the '470 patent is a representative claim, this time for the term "indicating"/"indication."  Claim 1 provides:

**1.** A method comprising:

maintaining a first association between a first user and corresponding addressing information of a first communication device used by the first user to log in;

maintaining a second association between a second user and corresponding addressing information of a second communication device used by the second user to log in, wherein the second communication device is separated from the first communication device by a wide area network;

wherein the first and second associations are dynamically changeable by keeping track of client programs at the respective communication devices so that the first and second users, if logged in, can be found no matter where they are located;

presenting a user interface on a display associated with the first communication device, the user interface including at least one of a scrollable list of identifiers of a plurality of users and a dial panel of identifiers for at least a subset of users from the scrollable list, wherein at least one of the scrollable list and the dial panel includes an identifier for the second user;

if the second user is not logged in, *indicating* to the first user that the second user is not logged in;

allowing the first user to select from the user interface the identifier of the second user;

in response to the first user selecting the identifier of the second user and if the second user is logged in, using the addressing information of the second communication device to allow communication between the first and second users, the communication

---

[6] '470 patent: claims 1, 16, 29, 43.

'921 patent: claims 1, 13, 25, 32.

United States District Court

For the Northern District of California

being established using either a communication type selected by the first user or a default communication type;

detecting an incoming request for communication, from at least a third user, at the first communication device of the first user during an active communication with the second user;

*indicating* to the first user the third user; and

providing the first user with an option of accepting the incoming request for communication with the third user.

'470 patent, claim 1 (emphasis added).

As a preliminary matter, the Court takes note that Pragmatus's proposed construction of "indicating"/"indication" does not accurately reflect its position on the merits. As evidenced in its opening brief, Pragmatus's actual position is that "'indication' can be a visual, a sound, *or* both. It just does not have to be both." Op. Br. at 12. Thus, what Pragmatus should have provided as a construction for "indicating" is "providing notice visually *and/or* by sound."

In its papers, Yahoo argues that there must always be both visual *and* aural notice (*i.e.*, visual notice alone or aural notice alone would not be enough) based on excerpts from the '470 specification found in columns 35-38. *See* Resp. Br. at 10-11. *See, e.g.*, '470 patent, col. 36:60-64 ("While discussing the Expert's advice, field representative **201** makes annotations **222** to image **220** in order to illustrate his concerns. While responding to the concerns of the field representative **201**, the Expert hears a beep and receives a visual notice (New Call window **223**) on his screen (not visible to the field representative and his client), indicating the existence of a new incoming call and identifying the caller."). But Yahoo's problem, once again, is that it relies on a preferred embodiment, and there is no clear indication in the specification that the patentee intended the preferred embodiment to be the exclusive embodiment, thereby disclaiming any claim scope. *See* '470 patent, col. 35:15-24 ("In order to illustrate how the present invention may be implemented and operated, an exemplary preferred embodiment will be described having features applicable to the aforementioned scenario involving remote access to expertise. It is to be understood that this exemplary embodiment is merely illustrative, and is not to be considered as limiting the scope of the invention, since the invention may be adapted for other applications (such as in engineering and manufacturing) or uses having more or less hardware, software and operating features and combined

United States District Court

For the Northern District of California

1   in various ways.").

2       Moreover, Pragmatus points to a part of the specification which reflects that an "indication"

3   can be made by visual notice alone.

> After a call has been set up, AVNM clients can send requests
> to the AVNM to change the state of the call [*i.e.*, active or not], which
> can advantageously be accomplished by controlling the callhandle
> states.  For example, during a call, a call request from another party
> could arrive.  This arrival could be signaled to the user by providing
> an alert indication in a dialogue box on the user's CMW
> [Collaborative Multimedia Workstation] screen.  The user could refuse
> the call by clicking on a refuse button in the dialogue box, or by
> clicking on a "hold" button on the active call window to put the
> current call on hold and allow the incoming call to be accepted.

10  '470 patent, col. 23:13-22.  In its brief, Yahoo argues that the above excerpt is not on point because

11  "the focus is on describing call state changes that happen during a teleconference, not describing the

12  alert indications."  Resp. Br. at 11.  But that argument is not persuasive because the text above

13  clearly refers to "an alert indication in a dialogue box on the user's screen."

14      The Court therefore construes "indicating" as providing notice visually and/or by sound.

15  G.    "revealing a corresponding identifier"[7]

| Pragmatus | Yahoo | Court |
|---|---|---|
| making known or showing the corresponding identifier | displaying previously hidden identifier | making known or showing the corresponding identifier |

20      For this claim term, a representative claim is claim 16 of the '470 patent.

21      **16.**  A method comprising:

22      maintaining a first association between a first user and corresponding
        addressing information of a first communication device used by the
        first user to log in, wherein the first communication device is a
        wireless device;

24      maintaining a second association between a second user and
        corresponding addressing information of a second communication
        device used by the second user to log in, wherein the second
        communication device is separated from the first communication
        device by a wide area network;

---

28      [7] '470 patent: claims 16, 29.

United States District Court

For the Northern District of California

wherein the first and second associations are dynamically changeable by keeping track of client programs at the respective communication devices so that the first and second users, if logged in, can be found no matter where they are located;

presenting a user interface on a display associated with the first communication device, the user interface including identifiers of a plurality of users including an identifier for the second user, wherein information associated with at least the second user is retrieved from at least one server;

allowing the first user to request communication with the second user by selecting the identifier of the second user from the user interface;

if the second user is not logged in, indicating to the first user that the second user is not logged in;

if the second user is logged in, indicating to the second user that the first user requested communication with the second user including *revealing a corresponding identifier* for the first user;

in response to the first user selecting the identifier of the second user and if the second user is logged in, using the addressing information of the second communication device to allow communication between the first and second users . . . .

'470 patent, claim 16 (emphasis added).

As the parties note, their dispute regarding "revealing a corresponding identifier" is really over the specific term "revealing."  According to Yahoo, "'revealing' means the identifier previously existed but was hidden," Resp. Br. at 11, while Pragmatus argues that "revealing" simply means making known or shown.

Yahoo premises its argument largely on a dictionary definition.  But, as Pragmatus points out, not all of the dictionary definitions of "reveal" require that something be hidden.  Indeed, the dictionary excerpt provided by Yahoo provides the following definitions for "reveal":

**1:** to make known through divine inspiration **2:** to make (something secret or hidden) publicly or generally known ⟨~a secret⟩ **3:** to open up to view: DISPLAY ⟨the uncurtained window ~ed a cluttered room⟩

Docket No. 43-6 (Palariu Decl., Ex. E) (Merriam Webster's Collegiate Dictionary, 10th ed. (1995)).

Pragmatus also makes a legitimate point in its reply brief that,

as anyone who has used such technology is aware, when you log in to a telecommunications system you will ordinarily see a list of who is online and who is not as well as an icon for each person.  And then,

United States District Court

For the Northern District of California

1  when you get a request for communication, the identity of the person
2  wishing to communicate with you as well as an icon related to the
   person will be communicated to you.  But nothing requires the
   "corresponding identifiers" to be "hidden" before the request for
3  communication is made.

4  Reply at 8.

5      Accordingly, the Court rejects Yahoo's construction and adopt Pragmatus's.

6  H.    "[audio/video] communication"[8]

7

| Pragmatus | Yahoo | Court |
|-----------|-------|-------|
| an exchange of [audio/video] information | synchronized, bidirectional exchange of [audio/video] information | a real-time exchange of [audio/video] information generally shared by participants |

11      For the term "[audio/video] communication," a representative claim is claim 6 of the '470

12  patent.  Claim 6 is dependent on claim 1.  Claim 1 provides as follows:

13          **1.**  A method comprising:

14          maintaining a first association between a first user and corresponding
            addressing information of a first communication device used by the
15          first user to log in;

16          maintaining a second association between a second user and
            corresponding addressing information of a second communication
17          device used by the second user to log in, wherein the second
            communication device is separated from the first communication
18          device by a wide area network;

19          wherein the first and second associations are dynamically changeable
            by keeping track of client programs at the respective communication
20          devices so that the first and second users, if logged in, can be found no
            matter where they are located;

21
22              presenting a user interface on a display associated with the first
            communication device, the user interface including at least one of a
            scrollable list of identifiers of a plurality of users and a dial panel of
23          identifiers for at least a subset of users from the scrollable list, wherein
            at least one of the scrollable list and the dial panel includes an
24          identifier for the second user;

25              if the second user is not logged in, indicating to the first user
            that the second user is not logged in;

26

27      [8] '470 patent: claims 6, 8, 20, 23, 33, 39, 42, 49.

28      '921 patent: claims 16 and 27.

22

United States District Court

For the Northern District of California

> allowing the first user to select from the user interface the identifier of the second user;
>
> in response to the first user selecting the identifier of the second user and if the second user is logged in, using the addressing information of the second communication device to allow *communication* between the first and second users, the communication being established using either a communication type selected by the first user or a default communication type;
>
> detecting an incoming request for communication, from at least a third user, at the first communication device of the first user during an active communication with the second user;
>
> indicating to the first user the third user; and
>
> providing the first user with an option of accepting the incoming request for communication with the third user.

'470 patent, claim 1 (emphasis added).

Claim 6, in turn, provides as follows.

> **6.** The method of claim **1**, wherein the communication between the first and second users includes at least one of a set consisting of *audio communications*, *video communications*, snapshot sharing, and data conferencing.

'470 patent, claim 6 (emphasis added).

As Pragmatus notes, the parties are in agreement that an audio/video communication is an exchange of information; the only dispute is whether the communication has to be both bidirectional and synchronized, as Yahoo contends.  *See* Op. Br. at 14.

Regarding synchronization, Pragmatus clarified at the hearing that it did not take issue with Yahoo's construction to the extent Yahoo simply meant that the communication must be in real time.  Rather, Pragmatus was more concerned that the use of the specific term "synchronized" would be confusing to the jury.  Although parts of the patent indicate that the opposite of real time is "asynchronous"[9] – and thus, Yahoo chose to use the word "synchronized" – the word

---

[9] *See* '470 patent, col. 5:23-27 (stating that, "[i]n a preferred embodiment, the system architecture employs separate real-time and asynchronous networks"); '470 patent, col. 5:34-42 (stating that "[t]he system architecture also accommodates the situation in which the user's desktop computing and/or communications equipment provides varying levels of media-handling capability[;] [f]or example, a collaboration session – whether real-time or asynchronous – may include participants whose equipment provides [various] capabilities").

United States District Court

For the Northern District of California

"synchronization" appears in other parts of the patent in a different context. For example, in the specification of the '470 patent, there is a section titled "Media Synchronization." That section provides, *inter alia*:

> A preferred manner for providing multimedia synchronization in the preferred embodiment will next be considered. Only multimedia documents with real-time material need include synchronization functions and information. Synchronization for such situations may be provided as described below.
>
> Audio or video segments can exist without being accompanied by the other. If audio and video are recorded simultaneously ("co-recorded"), the preferred embodiment allows the case where their streams are recorded and played back with automatic synchronization – as would result from conventional VCRs, laserdisks, or time-division multiplexed ("interleaved") audio/video streams. This excludes the need to tightly synchronize (i.e., "lip-sync") separate audio and video sequences. Rather, reliance is on the co-recording capability of the Real-Time Audio/Video Storage Server **502** to deliver all closely synchronized audio and video directly at its signal outputs.

'470 patent, col. 29:23-40.

The Court acknowledges that the excerpt above concerns a different kind of synchronization – *i.e.*, synchronization of audio and video – and that there need not be such synchronization of audio and video if, *e.g.*, a communication consists of audio only or video only, which is contemplated by the patent (as Yahoo admitted at the hearing). *See also* '470 patent, claim 6. Because of the potential for confusion, the Court shall use the term "real time" instead of "synchronized" to convey the idea that a communication must approximate a face-to-face communication in terms of time – in particular, that there is not a significant gap in time between the time that the communication is made to the time that the communication is received. *See* '470 patent, col. 2:4-9 (stating that "[o]ne or more of these other experts may be in a meeting, on another call, or otherwise temporarily unavailable[;] [i]n this event, the expert must communicate 'asynchronously' – to bridge time as well as distance"); '470 patent, col. 2:15-20 (stating that "telephone answering machines, voice mail, fax machines and conventional electronic mail systems provide incomplete solutions to the problems presented by deferred (asynchronous) collaboration").

At the hearing, Pragmatus did not object to the use of the term "real time" in lieu of "synchronized." As for Yahoo, it did not object to the use of the term "real time" per se. However,

United States District Court

For the Northern District of California

it did express concern that a construction that included only the "real time" requirement would be deficient.  In other words, according to Yahoo, the addition of the term "bidirectional" was critical because it conveyed something more.  As Yahoo stated at the hearing, under the invention claimed, information does not simply have to be transmitted; it also has to be received and utilized so that participants in the communication will all be "on the same page."

But the term "bidirectional" on its face is not particularly informative.  Moreover, the term could be misleading because, even though the patent clearly contemplates an exchange of information between parties, that does not necessarily mean that all information is exchanged.  *See* '470 patent, col. 38-43-64 (discussing "one-way digital video" because of technological constraints).  Therefore, the Court shall address Yahoo's concern but shall use language different from that proposed by Yahoo.  At the hearing, the Court proposed that the phrase "generally shared by participants" be added to the construction.  Yahoo did not dispute that inclusion of this phrase would largely take care of its concern.  Furthermore, Pragmatus stated that this additional language was acceptable.

Accordingly, the Court construes "[audio/video] communication" to mean "a real-time exchange of [audio/video] information generally shared by participants."

I.      "data conferencing"[10]

| Pragmatus | Yahoo | Court |
|-----------|-------|-------|
| a communication session among two or more participants sharing computer data in real time | a synchronized, bidirectional communication session among two or more participants that includes: (I) sharing a snapshot of a computer screen or (ii) sharing both the display and control of a running application; and may also include annotating the share data | a communication session among two or more participants sharing computer data in real time, including snapshot sharing (sharing of "snapshots" or selected regions of the user's screen), application sharing (shared control of running applications), shared whiteboard (equivalent to sharing a "blank" window), and associated telepointing and annotation capabilities |

_____

[10] '470 patent: claims 6, 7, 42.

For the term "data conferencing," claim 6 of the '470 patent is a representative claim.  Claim 6 provides:

> **6.** The method of claim **1**, wherein the communication between the first and second users includes at least one of a set consisting of audio communications, video communications, snapshot sharing, and *data conferencing*.

'470 patent, claim 6 (emphasis added).

Here, the dispute over the term "data conferencing" has two components: (1) whether the communication session must be synchronized and bidirectional and (2) whether the communication session must include either snapshot sharing or application sharing (*i.e.*, sharing both the control and display of running applications).  Yahoo argues that the answer is yes; Pragmatus asserts to the contrary.

### 1.      Synchronized and Bidirectional

The Court shall resolve the dispute regarding synchronized and bidirectional consistent with its analysis above.  That is, the Court shall use the term "real time" instead of "synchronized," and the Court shall address Yahoo's "bidirectional" concern by using, in its construction of the term "data conferencing," words related to sharing.

### 2.      Snapshot or Application Sharing

At the hearing, Pragmatus clarified that it did not have a problem per se with Yahoo's reference to snapshot sharing or application sharing in its proposed construction.  Rather, its problem was that Yahoo included only these examples of dataconferencing in its construction but not others, namely, a shared whiteboard.  Pragmatus points out that the specification talks about all three kinds of sharing as data conferencing:

> As used herein, desk-top teleconferencing includes real-time audio and/or video teleconferencing, as well as data conferencing.  Data conferencing, in turn, includes snapshot sharing (sharing of "snapshots" of selected regions of the user's screen), application sharing (shared control of running applications), shared whiteboard (equivalent to sharing a "blank" window), and associated telepointing and annotation capabilities.

'470 patent, col. 4:61-5:1.

At the hearing, Yahoo did not object to inclusion of a shared whiteboard.  Accordingly, the

1    Court adopts the above construction which refers to all three kinds of data sharing.

2    J.    "text communications"/"text"[11]

| Pragmatus | Yahoo | Court |
|---|---|---|
| communications involving characters | synchronized, bidirectional character transmission | communications involving characters |

7    For the term "text communications"/"text," there are several representative claims from the

8    '470 patent.

9    •    "**7.**  The method of claim **6**, wherein the data conferencing includes text communications."

10        '470 patent, claim 7.

11    •    "**21.**  The method of claim **16**, wherein the communication includes text."  '470 patent, claim

12        21.

13    •    "**34.**  The method of claim **29**, wherein the communication includes real-time text."  '470

14        patent, claim 34.

15    The primary dispute regarding "text communications"/"text" is whether there is a

16    synchronized and bidirectional requirement.  As indicated above, in the context of evaluating *audio*

17    *and video* communications, the Court did not use the terms "synchronized" and "bidirectional" in its

18    construction; however, it did include language to convey similar concepts – *e.g.*, real time and

19    sharing.

20    With regard to real time, the Court finds that such a limitation is appropriate for audio/video

21    communication but not for text communication/text.  First, the specification clearly contemplates

22    that text need not be in real time: "In a preferred embodiment, the system architecture employs

23    separate real-time and asynchronous networks – the former for real-time audio and video, and the

24    latter for *non-real-time* audio and video, *text*, graphics and other data, as well as control signals."

25    '470 patent, col. 5:23-27 (emphasis added).  Second, the doctrine of claim differentiation also

27    [11] '470 patent: claims 7, 21, 34, 50.

28        '921 patent: claims 2, 24, 26.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

supports the conclusion that text need not be in real time.  *See Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 857-58 (9th Cir. 2014) (stating that "[t]he doctrine of claim differentiation is 'based on the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope'").  For example, the '470 patent specifically contemplates when real-time text is required and when it is not:

- "**21.**  The method of claim **16**, wherein the communication includes *text*."  '470 patent, claim 21 (emphasis added).

- "**34.**  The method of claim **29**, wherein the communication includes *real-time text*."  '470 patent, claim 34 (emphasis added).

As for the notion of sharing, that is already subsumed within the claims which refer to a *communication* that includes text.  To the extent Yahoo further suggests (as it did at the hearing) that a text communication takes place only in the context of data conferencing, that is not supported by the language of the claims.  For example, claim 21 of the '470 patent states: "The method of claim **16**, wherein the communication includes text."  '470 patent, claim 21.  No reference is made to data conferencing at all.  In contrast, claim 7 of the '470 patent states: "The method of claim **6**, wherein the data conferencing includes text communications."  '470 patent, claim 7.  The principle of claim differentiation underscores that text communication can but need not take place in the context of data conferencing.  While Yahoo argues that the only embodiment of text communication in the specification is within the context of data conferencing, that ignores the well-established Federal Circuit law that, "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a claim intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'"  *Liebel-Flarsheim*, 358 F.3d at 906.

The Court therefore simply defines "text communications"/"text" as communications involving characters.

///

///

///

28

**United States District Court**
For the Northern District of California

K.      "establishing communication"/"communication being established"[12]

| Pragmatus | Yahoo | Court |
|-----------|-------|-------|
| plain and ordinary meaning; no construction necessary | setting up the necessary communication paths between the caller and callee;<br><br>the necessary communication paths between the caller and the callee having been set up | plain and ordinary meaning |

A representative claim for the term "establishing communication"/"communication being established" is claim 1 of the '470 patent.  Claim 1 provides:

> **1.** A method comprising:
>
> maintaining a first association between a first user and corresponding addressing information of a first communication device used by the first user to log in;
>
> maintaining a second association between a second user and corresponding addressing information of a second communication device used by the second user to log in, wherein the second communication device is separated from the first communication device by a wide area network;
>
> wherein the first and second associations are dynamically changeable by keeping track of client programs at the respective communication devices so that the first and second users, if logged in, can be found no matter where they are located;
>
> presenting a user interface on a display associated with the first communication device, the user interface including at least one of a scrollable list of identifiers of a plurality of users and a dial panel of identifiers for at least a subset of users from the scrollable list, wherein at least one of the scrollable list and the dial panel includes an identifier for the second user;
>
> if the second user is not logged in, indicating to the first user that the second user is not logged in;
>
> allowing the first user to select from the user interface the identifier of the second user;
>
> in response to the first user selecting the identifier of the second user and if the second user is logged in, using the addressing

---

[12] '470 patent: claims 1, 16, 29, 43.

'921 patent: claim 13.

information of the second communication device to allow communication between the first and second users, the *communication being established* using either a communication type selected by the first user or a default communication type;

detecting an incoming request for communication, from at least a third user, at the first communication device of the first user during an active communication with the second user;

indicating to the first user the third user; and

providing the first user with an option of accepting the incoming request for communication with the third user.

'470 patent, claim 1 (emphasis added).

The Court agrees with Pragmatus that it can simply rest on plain and ordinary meaning with respect to the above term. While Yahoo argues that the term here has "a more specific meaning" than the "ordinary meaning outside of the context of these claims and patents," Resp. Br. at 17, that argument is not persuasive – especially because Yahoo's proposed construction uses language that is very similar to the term language itself.

The main difference between Yahoo's proposed construction and the term on its face is that Yahoo's proposed construction refers to "communication *paths*." But here Pragmatus brings up a valid point – *i.e.*, that Yahoo's construction requires *multiple* paths (*i.e.*, plural) when in fact "the preferred embodiment discloses using a single direct path between caller and callee." Op. Br. at 17.

Next to be described in connection with FIG. **4** is the advantageous manner in which the present invention provides for real-time audio/video/data communication among geographically dispersed MLANs [Multimedia Local Area Networks] **10** via WAN [Wide Area Network] **15** (FIG. **1**), whereby communication delays, cost and degradation of video quality are significantly minimized from what would otherwise be expected.

Four MLANs **10** are illustrated at locations A, B, C and D. . . .

. . . .

The system also provides optimal routes for audio/video signals through the WAN. For example, in FIG. **4**, location A can either take a direct route to location D via path **47**, or a two-hop route through location C via paths **48** and **49**. If the direct path **47** linking location A and D is unavailable, the multipath route via location C and paths **48** and **49** could be used.

470 patent, col. 10:35-11:16.

**United States District Court**
For the Northern District of California

1    Notably, in its responsive brief, Yahoo fails to address this excerpt from the '470

2 specification. Admittedly, Yahoo does point to other parts of the '470 specification that suggest

3 multiple paths.

4    •    "For example, to provide multi-party teleconferencing, an initiating CMW **12** signals MLAN

5        Server **60** via Data LAN hub **25** identifying the desired conference participants. After

6        determining which of these conferees will accept the call, MLAN Server **60** controls A/V

7        Switching Circuitry **30** (and CMW software via the data network) to set up *the required*

8        *audio/video and data paths* to conferees at the same location as the initiating CMW." '470

9        patent, col. 9:19-26 (emphasis added).

10   •    "The callee's Collaboration Initiator then notifies the AVNM as to whether the call will be

11       accepted or refused. If the call is accepted (**7**), the AVNM *sets up the necessary*

12       *communication paths* between the caller and the callee required to establish the call. The

13       AVNM then notifies the caller's Collaboration Initiator that the call has been established by

14       sending it an accept event (**8**). If the caller and callee are at different sites, their AVNMs will

15       coordinate in *setting up the communication paths* at both sites, as required by the call." '470

16       patent, col. 22:37-46 (emphasis added).

17 But that there can be multiple communication paths does not necessarily mean that a single

18 communication path is foreclosed.

19 L.    "service programs"[13]

20

| Pragmatus | Yahoo | Court |
|---|---|---|
| set of instructions that tell a computer to perform a service | indefinite | set of instructions that tell a computer to perform a service |

24    The dispute over the term "service programs" is really a dispute over whether the term is

25 indefinite. Under Federal Circuit law, "'[a] claim is indefinite only when it is not amenable to

26

27

_____

28    [13] '921 patent: claims 1, 6, 7, 8, 9, 13, 21, 22, 23, 25, 29, 30, 31, 32.

construction or insolubly ambiguous.'"[14]  *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1368 (Fed. Cir. 2013).

Claim 1 of the '921 patent is a representative claim for the term "service programs".  Claim 1 provides in relevant part:

> **1.**  A system for use in communication between a plurality of users:
>
> one or more *service programs*; and
>
> one or more collaboration initiation programs;
>
> wherein at least one of the one or more *service programs* and one or more collaboration programs are for:
>
> maintaining a first association between a first user and corresponding addressing information of a second communication device used by the second user to log in, wherein the second communication device is separated from the first communication device by a wide area network; wherein the first and second associations are dynamically changeable by keeping track of client programs at the respective communication devices so that the first and second users, if logged in, can be found no matter where they are located;
>
> presenting a user interface on a display associated with the first communication device, the user interface including at least one of a scrollable list of identifiers of the plurality of users and a dial panel of identifiers for at least a subset of users from the scrollable list, wherein at least one of the scrollable list and the dial panel includes an identifier for the second user;
>
> allowing the first user to select the identifier of the second user from the user interface;
>
> if the second user is not logged in, indicating to the first user that the second user is not logged in;
>
> in response to the first user selecting the identifier of the second user and if the second user is logged in, using the addressing information of the second communication device to allow communication between the first and second users, the communication being established using either a communication type selected by the first user or a default communication type;
>
> detecting an incoming request for communication, from at least a third user, at the first communication device of the first user during an active communication with the second user;

---

[14] The Court notes that "[t]here is some ambiguity in the case law as to whether a finding of indefiniteness should occur during claim construction, or whether it should occur at a later step." *ASM Am., Inc. v. Genus, Inc.*, No. C-01-2190 EDL, 2002 U.S. Dist. LEXIS 15348, at *42 (N.D. Cal. Aug. 15, 2002).

United States District Court

For the Northern District of California

1

2

3

indicating to the first user the third user; and

providing the first user with an option of accepting the
incoming request for communication with the third user.

4   '921 patent, claim 1 (emphasis added).

5        Yahoo argues indefiniteness in large part because the term "service programs" – though used

6   in some of the '921 patent claims – does not appear anywhere in the specification.

7        In response, Pragmatus argues that, although not specifically defined in the specification, the

8   term "service programs" can readily be understood by a person of ordinary skill in the art as

9   programs that provide services.  A "program," according to Pragmatus, is "a set of instructions that

10  tell a computer to perform a series of actions or a particular type of work."  Op. Br. at 18.  In

11  support, Pragmatus points to a Microsoft Computer Dictionary.  The dictionary definition offered by

12  Pragmatus is consistent with the use of the word "program" in the '921 specification.[15]  For

13  example:

14  •    "Also present on the Expert's screen is a standard desktop window **206** containing icons

15        from which other programs (whether or not part of ths invention) can be launched."  '921

16        patent, col. 36:21-24.

17  •    "The Expert composes a new multimedia mail message, recording his image and audio

18        synchronized (as described above) to the screen displays resulting from his simultaneous

19        interaction with his CMW (e.g., running a program that performs certain calculations and

20        displays a graph while the Expert illustrates certain points by telepointing on the screen,

21        during which time his image and spoke words are also captured)."  '921 patent, col. 39:59-

22        66.

23        Yahoo protests, however, that the term at issue here is not "program" but rather "service

24  program."  The question thus becomes whether it would be reasonable for a person of ordinary skill

25

26        [15] Yahoo challenges Pragmatus's reliance on the dictionary because it was published in 2002
27  and, here, the patent dates back to a priority filing of October 1, 1993 (even though the application
    itself was technically filed in 2003.  This argument elevates form over substance because, as noted
28  above, the specification for the '921 patent uses the word "program" in the same way as the
    dictionary definition.

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1    in the art to understand that a "service program" would be a program that provides services. That is,

2    needless to say, a logical inference. Moreover, claim 1 on its face indicates the types of services that

3    a service program would provide – *i.e.*, the service program is part of "[a] system for use in

4    communication between a plurality of users" and, among other things, it "maintain[s] a first

5    association between a first user and corresponding addressing information of a first communication

6    device used by the first user to log in." '921 patent, claim 1. The specification for the '970 patent

7    also indicates the types of services:

8          The central component of the Collaborative Multimedia Workstation
          software is the Collaboration Initiator **161**. All collaborative functions

9          can be accessed through this module. When the Collaboration
          Initiator is started, it exchanges initial configuration information with

10         the Audio Video Network Manager (AVNM) **60** (shown in FIG. **3**)
          through Data Network **902**. Information is also sent from the

11         Collaboration Initiator to the AVNM indicating the location of the
          user, *the types of services available on that workstation (e.g., video-*

12         *conferencing, data conferencing, telephony, etc.)* and other relevant
          initialization information.

13

14    '970 patent, col. 18:57-67 (emphasis added).

15        The Court, therefore, rejects Yahoo's contention that the term "service programs" is not

16    amenable to construction or is insolubly ambiguous. The Court adopts the construction proposed by

17    Pragmatus. With such a construction, the term is not indefinite.

18                   **II.**    **CONCLUSION**

19        For the foregoing reasons, the Court adopts the above constructions for the disputed terms at

20    issue.

21

22        IT IS SO ORDERED.

23

24    Dated: May 13, 2014

25                                    _____

26                                  EDWARD M. CHEN
                                  United States District Judge

27

28